Sally DIVILLY,

v.

**PORT AUTHORITY OF ALLEGHENY COUNTY, Appellant.**

Commonwealth Court of Pennsylvania.

Argued Oct. 7, 2002.
Decided Nov. 19, 2002.

Terrance R. Henne, Pittsburgh, for appellant.

Edward A. Yurcon, Pittsburgh, for appellee.

BEFORE: McGINLEY, Judge, and COHN, Judge, and FLAHERTY, Senior Judge.

OPINION BY Senior Judge FLAHERTY.

The Port Authority of Allegheny County (Authority) appeals from a decision of the Court of Common Pleas of Allegheny County (trial court) which granted the Motion for Post–Trial Relief filed by Sally Divilly (Divilly) and ordered that a new trial be held after a jury returned a verdict in favor of the Authority. We reverse.

Divilly was a passenger on an Authority bus that was involved in a traffic accident. Divilly sued the Authority for injuries she allegedly sustained during that accident. During the trial, Divilly testified that on

September 9, 1996, she boarded an Authority bus. Divilly was sitting in the center of the bus facing the middle door and a metal pole was located in front of her. As the bus was making a right turn around the West End Circle on Steuben Street, it came into contact with a "Jersey barrier".[1] The impact shook the bus and caused Divilly's head to move backward and hit the window and then move forward and hit the metal pole in front of her. Divilly stated that the bus was going faster than usual when this incident occurred. The bus driver continued driving and eventually stopped the bus near the Gateway View Plaza on West Carson Street and reported the accident. The Sheriff's Department and several ambulances responded and Divilly was taken to Allegheny General Hospital. At the hospital a doctor told Divilly that she sustained a concussion and then sent her home by taxi that night. As a result of this incident, Divilly suffers from pain in her neck, back and feet and is unable to continue performing her job as a waitress, which she has held for approximately thirty years. Since the accident, Divilly has been treating with Rodrigo M. Estonilo, M.D. (N.T. 9/6–10/01, pp. 55–81).

Dr. Estonilo, a neurosurgeon, testified by videotape deposition. In October of 1996, he began treating Divilly for pain related to the September 9, 1996 incident. Dr. Estonilo opined that Divilly suffered from degenerative changes in the discs of her cervical spine before the accident but that this condition was asymptomatic, or dormant. However, this condition was exacerbated and caused to be symptomatic by the September 9, 1996 incident. Because of the pain that Divilly experiences as a result of this condition, Dr. Estonilo concluded that she is not capable of work-

ing. On cross examination, Dr. Estonilo admitted that objective tests performed on Divilly at Allegheny General Hospital after the accident, including an X-ray, a flexion and extension X-ray of the neck and a CT scan were all negative and that there was no evidence of foot trauma.

The bus driver, Samuel Guarino, also testified. On the day of the accident, Mr. Guarino was driving a "flexible" bus, which has a long wheelbase and which requires longer turns. Because it has a long wheelbase, the back end does not follow as quickly when making a turn. Even though the bus is called flexible, Mr. Guarino explained that the bus "doesn't bend in the middle, it is not like a tractor-trailer. So you have to take it out without going over into the oncoming lane. Then you bring it around because you have to miss whatever could be on your right side to the rear." (N.T. 9/6–10/01, p. 154). Mr. Guarino explained that when he started to make the right turn around the West End Circle, "there was a car over the line. My front end, which is square, it is completely squared off, it is not rounded, it is square, it is in my lane, but it is maxed. I am near my side of that lane ... With these cars coming over, one over the line I had to— there is no time to think. There is two choices here. I either get the bus out of the way or I am going to make contact with this vehicle." (N.T. 9/6–10/01, pp. 154–155). Mr. Guarino testified that this oncoming vehicle was a couple of feet over the yellow line. To avoid this vehicle, Mr. Guarino cut the bus to the right and, in doing so, the front of the bus "cleared everything with no problem, but the rear end of the bus made contact with the jersey barrier." (N.T. 9/6–10/01, pp. 155– 156). If he hadn't moved to the right, Mr.

1. A Jersey barrier is "[a] protective concrete barrier used as a highway divider and a means of preventing access to a prohibited area" that was first used on the New Jersey Turnpike. The American Heritage Dictionary of the English Language (4th ed.2000).

Guarino surmised that he would have collided with this vehicle. Mr. Guarino testified that making contact with the Jersey barrier was "much like grazing a curb going around a bend of the sidewalk in a bus. The motion of the bus was just a rocking motion ..." (N.T. 9/6–10/01, pp. 156). Mr. Guarino estimated that he was going between twenty and twenty-five miles per hour at this time. After this occurred, Mr. Guarino looked in the mirror and asked the passengers if they were all right. Some passengers indicated that they were not all right and Mr. Guarino pulled into a parking lot and called the Authority which in turn called paramedics and the Sheriff's department.

James Hensell was the detective for the Sheriff's office who arrived at the scene of the accident. Mr. Guarino does not remember telling Detective Hensell about the oncoming car. However, on the report that Mr. Guarino filled out for the Authority on the day of the accident, he described the accident as "Proceed inbound in the West End Circle approaching Carson Street ramp, oncoming traffic was close, and I turned flexible bus short and contacted the jersey barrier." (N.T. 9/6–10/01, p. 159).

On cross-examination, Mr. Guarino was questioned as to why he did not tell Detective Hensell about the oncoming car. Mr. Guarino replied that "I don't recall what my state of mind was at the time. I was starting to get concerned." (N.T. 9/6–10/01, p. 162). Mr. Guarino also related that he could not recall any details about the oncoming car. Mr. Guarino further testified that his route foreman arrived at the accident scene and that he could not recall whether he told him about the oncoming car, although he acknowledged that the route foreman's report does not mention an oncoming car. Mr. Guarino explained that "[t]hese guys showed up and started asking me questions and I started talking. I am very concerned about what is going on here and a little upset about what is going on ... people started to say that they are hurt. Now people are starting to say that they are hurt and it is going to concern you." (N.T. 9/6–10/01, p. 176–177). Mr. Guarino was also asked "how this car could have been so close to your bus when you have [a traffic] island and an untraveled portion of the highway there?" Mr. Guarino responded that "[b]ecause people travel up there and they do whatever it is that they want to do to get to where they have to go." (N.T. 9/6–10/01, p. 163). Mr. Guanino was also asked: "And there is a large area separating your lane of travel from the lane of travel that this so-called phantom vehicle that you didn't get any information about, isn't it?" Mr. Guarino answered: "According to that picture, yes ... But it doesn't depict the traffic flow, sir, and how people drive." (N.T. 9/6–10/01, p. 164).

Detective Hensell testified that the damage to the bus was "[v]ery minimal. It was a rubber molding that went down the right side rear." (N.T. 9/6–10/01, p. 132). Detective Hensell stated that he interviewed Mr. Guarino and the passengers and then prepared a report, which states: "Bus operator stated that he came around the bend, he thought that he bumped a curb, but he brushed against a jersey barrier." (N.T. 9/6–10/01, p. 136). His report does not indicate that there was an oncoming vehicle when the accident occurred, nor could he recall Mr. Guarino mentioning an oncoming vehicle. However, Detective Hensell stated that he did not have a lengthy conversation with Mr. Guarino and never asked him why he cut the turn short.

At the conclusion of the trial, the trial Judge instructed the jury that "[i]f you

find that the Defendant has proven that it was confronted with a sudden emergency not of its own making, you must determine whether the Defendant's [response] to that emergency was reasonable under the circumstances. If you find that the response was reasonable, if you find that the sudden emergency did exist, your verdict must be for the Defendant." (N.T. 9/6–10/01, p. 245). The trial Judge also instructed the jury with regard to the burden of proof in civil cases and informed them that they have the power to evaluate the credibility of witnesses.

On September 10, 2001, the jury returned a verdict in favor of the Authority. On September 18, 2001, Divilly filed a Motion for Post Trial Relief arguing that the verdict in favor of the Authority was against the weight of the evidence and that, for this reason, a new trial should be granted. On February 13, 2001, the trial Judge issued a Memorandum and Order stating that:

It is axiomatic that statements made "closer in time" to the incident in question are inherently more reliable. There is no time for premeditation and design that would otherwise make such statements unreliable or not accurate. At the time of the trial, some 5 years after the accident, the PAT driver testified that the incident occurred due to a vehicle approaching his bus in his lane. If that were the reason, then it would be common sense to immediately report that fact to the investigator on the scene, who was the Deputy Sheriff, and to his route foreman who arrived shortly after the incident, as well as to specifically document that in his report ... prepared later that day. However, the PAT driver did not. (N.T. pp. 161–163). Instead, the PAT driver testified that on

the day of the accident, he did not tell the Deputy Sheriff, nor his route supervisor, and even testified that his report, written by him on the date of the incident upon his return to the garage, says "(P)roceed inbound in West End Circle approaching Carson Street ramp, oncoming traffic was close, and I turned flexible bus short and contacted the jersey barrier." (N.T. p. 159). At no time immediately after the incident does the PAT driver mention an on-coming vehicle approaching in his bus lane. The oncoming vehicle account only arrives on the scene as a "phantom" vehicle at the time of his deposition, some 4 years later! (N.T. pp. 159–160).[2]

(February 13, 2002 Memorandum and Order, p. 5) (emphasis omitted). Additionally, the trial Judge found it significant that Divilly had no medical problems prior to the date of the traffic accident. Accordingly, the trial Judge held that "[c]onsidering the testimony of the PAT driver, as noted above ... and the uncontradicted evidence that Divilly suffered injuries as a result of the accident, I find that the jury's verdict was improbable and at variance with the facts ... and being mindful that it is often difficult to establish that a jury's verdict "shock's the court's sense of justice", I am convinced that in this particular case, the jury's verdict is "shocking" based on my analysis. Accordingly, I find the verdict to be against the weight of the evidence, and on this basis, I will grant Divilly's motion for a new trial." (February 13, 2002 Memorandum and Order, pp. 6–7) (emphasis omitted). This appeal followed.

■■■ Although the trial court stated that it decided to grant a new trial based on the testimony of the bus driver, Mr.

---

**2.** This case was initially arbitrated and Mr. Guarino's testimony was taken by deposition for the purposes of the arbitration proceedings four years after the accident.

Guarino, and the uncontradicted medical evidence, the trial court also mentioned that the jury's verdict shocked its sense of justice. When a trial court grants a new trial in the name of "justice", our scope of review is broad, in that we must examine the entire record to determine whether any reason, even if not mentioned by the trial court, merits the granting of a new trial. The trial court's decision will only be reversed if it has abused its discretion in granting a new trial. *See Coker v. S.M. Flickinger Co., Inc.,* 533 Pa. 441, 448, 625 A.2d 1181, 1185 (1993). "[W]hen viewed in terms of the degree of scrutiny that should be applied, an inquiry into an abuse of discretion is operationally equivalent as one into the merit of the trial court's decision." *Id.* "Where the record adequately supports the trial court's reasons and factual basis, the court did not abuse its discretion. However, if the record discloses that evidence was merely conflicting, then the new trial order would have to be reversed. This is because in that situation, the trial court invaded the province of the jury." *Id.* at 453, 625 A.2d at 1187. (citations omitted).

█ With regard to whether Divilly actually suffered any injuries, Dr. Estonilo did testify that Divilly suffers from injuries as a result of the September 9, 1996 incident and the Authority did not present any medical evidence to contradict this testimony. However, on cross-examination, Dr. Estonilo did admit that the objective tests performed on Divilly after the incident were negative. The jury, as the factfinder, was certainly entitled to disbelieve both the testimony of both Divilly and Dr. Estonilo regarding whether Divilly was actually injured. Of course, it is impossible to know whether or not the jury believed the testimony of Dr. Estonilo because, if the jury believed the testimony of Mr. Guarino, whether or not Divilly was actually injured would be irrelevant for the fol-

lowing reason: If Mr. Guarino did actually encounter a sudden emergency, i.e., the oncoming car, the Authority would not be liable for her injuries because of the sudden emergency doctrine. In *Cunningham v. Byers,* 732 A.2d 655 (Pa.Super.1999), our Superior Court summarized this doctrine as follows:

> The sudden emergency doctrine provides a defense in a negligence action to a driver of a motor vehicle who suddenly and unexpectantly finds himself confronted with a perilous situation that permits no opportunity to assess the danger and respond appropriately. *Elder v. Orluck,* 334 Pa.Super. 329, 483 A.2d 474, 487 (1984), *affirmed,* 511 Pa. 402, 515 A.2d 517 (1986). Situations which may constitute a sudden emergency include a dust cloud, a moving object, a sudden blocking of the road, the sudden swerving of another vehicle, blinding lights and a dense patch of fog. *Dickens [v. Barnhart,* 711 A.2d 513] at 517 (Pa.Super.1998); *Levey v. DeNardo* 555 Pa. 514, 725 A.2d 733 (1999) Our Supreme Court recently reiterated the purpose of this doctrine stating:
>
> [A] person confronted with a sudden and unforeseeable occurrence, because of the shortness of time to react, should not be held to the same standard of care as someone confronted with a foreseeable occurrence. It is important to recognize, however, that a person cannot avail himself of the protection of this doctrine if that person was himself driving carelessly or recklessly.

*Id.* at 657–658.

After reviewing the facts of this case, it is clear that Mr. Guarino did not mention the oncoming vehicle to Detective Hensell or his supervisor. However, Mr. Guarino testified that he was in a different state of mind after the accident because he was concerned about the passengers that indicated they were injured. Further, Detec-

tive Hennessy himself acknowledges that he did not have a lengthy conversation with Mr. Guarino after the incident and never asked him why he cut the turn short. Additionally, Mr. Guarino did note in his report, which was prepared the day of the incident, that the "oncoming traffic was close." Although the fact that Mr. Guarino did not testify as to this oncoming vehicle until four years later in a deposition justifiably may give rise to a great deal of skepticism on the part of the trial judge, it is of no consequence, as this was the first time he was asked, on the record, about the events surrounding the incident that occurred on September 9, 1996 and, further, the trial court did not declare Mr. Guarino's testimony incredible and unworthy of belief. Therefore, there was evidence that, if believed by the jury, would prove that Mr. Guarino did encounter a sudden emergency that caused him to strike the Jersey barrier and that, for this reason, Divilly's injuries were not caused by any negligence of Mr. Guarnino. Because the evidence in this case with regard to whether Mr. Guarino actually turned to miss an oncoming vehicle to avoid an accident was merely conflicting, the trial court invaded the province of the jury in granting a new trial. Furthermore, after examining the record, we can find no other reason why justice would require a new trial in this matter.

Accordingly, the order of the trial court is reversed.

### ORDER

AND NOW, November 19, 2002, the order of the Court of Common Pleas of Allegheny County docketed at No. GD98–2814 and dated February 13, 2002 is hereby REVERSED.