J-A31019-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| RICHARD AND MARIA DAVIS | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| FIDELITY NATIONAL TITLE INSURANCE COMPANY D/B/A FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK | |
| Appellant | No. 672 MDA 2014 |

Appeal from the Judgment Entered May 28, 2014
In the Court of Common Pleas of Lackawanna County
Civil Division at No(s): 10-00-8868

BEFORE:  BOWES, J., OTT, J., and STABILE, J.

MEMORANDUM BY OTT, J.:                    **FILED MARCH 18, 2015**

Fidelity National Title Insurance Company d/b/a Fidelity National Title Insurance Company of New York (Fidelity) appeals from the judgment entered on May 28, 2014, in the Court of Common Pleas of Lackawanna County. Plaintiffs, Richard and Maria Davis (collectively Davis), filed a complaint against Fidelity alleging breach of contract and bad faith regarding a dispute over ownership of a 1.86 acre parcel of land. The parties proceeded to a bench trial before the Honorable Carmen D. Minora who found in favor of Davis on both counts and awarded an aggregate verdict of $2,062,746.89. Fidelity raises five issues in this timely appeal. After a thorough review of the submissions by the parties, relevant law, and the certified record, we affirm.

The factual history of this matter is complex and we rely upon the Final Memorandum and Order on [Fidelity's] Motion for Past-Trial Relief, 3/28/2014, Memorandum and Order, 8/15/2013 (including findings of fact), and Stipulated Undisputed Facts, Joint Pre-Trial Order, 12/17/2012.

For brevity's sake, we simply recount that this matter concerned Davis' claim against his Fidelity Title Insurance policy regarding disputed title to 1.86 acres of land Davis sought to develop as part of a housing project. Davis purchased the property as part of a 15-acre acquisition in 2004. In 2007, as Davis attempted to obtain a zoning exception at a public hearing, Louis Norella objected, claiming to be the rightful owner. Davis filed his claim against the policy in October 2007. In June 2009, Fidelity acknowledged a problem with the title and promised resolution of the matter. Although Norella demanded $40,000.00 for the disputed property in 2010, Fidelity did not resolve the issue until it purchased the property from Norella for $50,000.00 in August 2012. Davis claimed the delay in resolution of the matter caused him to delay his development project, costing him lost profits. Additionally, Davis argued the delay represented unconscionable behavior and bad faith.

Fidelity's first three claims address the trial court's determination of lost profits. Fidelity argues the award was based upon speculation, lacked evidentiary support, and lacked proof of causal connection to any Fidelity action. The trial court awarded compensatory damages of $224,760.00, consisting of $89,760.00 for increased building costs and $135,000.00 in lost

profits. Davis' claim of lost profits was based on the expert testimony of Jean Black, a licensed real estate appraiser. She based her calculations on the relative value of the proposed townhomes in December 2008 as compared to January 2012. Based upon these dates, Black calculated lost profits of $272,000.00.[1]

Fidelity argues that (1) the housing development was nothing more than "hypothetical", (2) the trial judge called Black's testimony futuristic, lacking credibility and unpersuasive,[2] (3) there was no historic basis of sales upon which to determine profitability, and (4) the award was lacking in evidentiary support and speculative. We disagree.

First, the trial judge clearly rejected Fidelity's position that the development project was nothing more than hypothetical.[3] The evidentiary record demonstrated Davis had taken several steps to realize the project. He had purchased plans, engaged engineers, conducted surveys and was only stopped when he sought a zoning exception and the problem with the

_____

[1] Davis did not claim damages from the total inability to proceed with the development project. Rather, Davis claimed the diminution in value (DIV) between the ability to proceed with the project in a timely fashion and the delayed project.

[2] **See** Memorandum and Order, 8/15/2013, at 20, ¶ 22.

[3] **See** Appellant's Brief, Statement of Questions Involved, at 4, Questions 1-2.

title was discovered. Accordingly, the underlying basis for the award of lost profits is supported by the record.

As noted, the actual calculation of lost profits was based upon the testimony of Jean Black. Black testified that she chose December 2008 as a starting point for calculating lost profits because it was a little over one year after Davis filed the claim against Fidelity (October 2007). This estimate gave Davis one year to build the townhomes. She further testified, "If we needed a more specific time, the reason we don't have it is because they [Fidelity] didn't resolve this claim." *See* N.T. trial, 1/29/2013, at 230. Despite accepting Davis' underlying premise of the existence of damages and Black's method of calculation thereof, the trial court rejected Black's presumptive starting date. Fidelity argues this rejection essentially recognizes the claim for damages was speculative.

While we agree that selection of a starting date to calculate damages necessarily includes an estimation, that necessity is largely the result of Fidelity's actions. Our Supreme Court has stated:

> [T]here should be no doubt that recovery will not be precluded simply because there is some uncertainty as to the precise amount of damages incurred. It is well established that mere uncertainty as to the amount of damages will not bar recovery where it is clear that damages were the certain result of the defendant's conduct. ... The basis for this rule is that the breaching party should not be allowed to shift the loss to the injured party when damages, even if uncertain in amount, were certainly the responsibility of the party in breach.

*Spang v. United States Steel Corporation*, 545 A.2d 861, 866 (Pa. 1988), *quoting* *Pugh v. Holmes*, 405 A.2d 897 (Pa. 1979).

Additionally,

While damages cannot be based on a mere guess or speculation, yet where the amount may be fairly estimated from the evidence, a recovery will be sustained even though such amount cannot be determined with entire accuracy.[4]

> "Williston on Contracts, Revised Edition, Vol. 5, lays down these principles in respect to measuring damages: Section 1345, p. 3776. ... 'though there must be evidence of substantial damage in order to justify recovery of more than a nominal sum, *the exact amount need not be shown. Where substantial damage has been suffered, the impossibility of proving its precise limits is no reason for denying substantial damages altogether.'*
>
> * * *
>
> The essence of the legal principles above cited is that *compensation for breach of contract cannot be justly refused because proof of the exact amount of loss is not produced,* for there is judicial recognition of the difficulty or even impossibility of the production of such proof. What the law does require in cases of this character is that the evidence shall with a fair degree of probability establish a basis for the assessment of damages."

477 Pa. at 41-42, 383 A.2d at 812 (Opinion in support of affirmance and modification; further citations omitted). *See also* comment (a) to Restatement (Second) of Contracts, § 352 ("Doubts are generally resolved against the party in breach. A party who has, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred.") and *Delahanty v. First Pennsylvania Bank*, 318 Pa. Super. 90, 464 A.2d 1243 (1983) ("justice and public policy

---

[4] *Quoting* *Osterling v. Frick*, 131 A. 205 (Pa. 1925).

require that the wrongdoer bear the risk of uncertainty which his own wrong has created and which prevents the precise computation of damages").

***Spang***, 545 A.2d at 866-867.

Accordingly, Pennsylvania law has long recognized that where the existence of damages is certain and due to defendant's actions, the defendant will not be able to benefit from the lack of complete certainty in assessing those damages. Here, Black provided adequate methodology to calculate lost profits and the trial court, acknowledging the uncertainty in assigning a starting point, used its discretion to move the starting date forward two years to provide extra time to accomplish the development.[5] The evidence of record, therefore, provides reasonable certainty for the calculation of damages.

Fidelity's final argument regarding compensatory damages is an allegation that there is no evidentiary causal connection between its actions and the damages claimed. It is undisputed that Fidelity took approximately five years to resolve this title claim. It is also undisputed that Davis intended to put the townhome portion of the development on the disputed property. It cannot be credibly maintained that Davis could have built on the disputed portion of land prior to the resolution of the title dispute. Davis

---

[5] We note that the trial court could have simply accepted Black's starting point as reasonable, and such would have been supported by the record. By exercising his discretion, the trial judge relieved Fidelity of substantial additional liability to Davis.

faced the choice of going forward with his project without the townhomes, which would have required new plans to accommodate shifting of roads and the like, or waiting to resolve the dispute and moving forward as planned. As will be more fully discussed in the bad faith discussion, Fidelity had two options in resolving the problem: Fidelity could purchase the disputed property for Davis or pay Davis the value of the land. Yet, Fidelity dithered for years, unwilling to make a decision regarding how it was going to proceed. Fidelity's delay directly led to Davis' inability to go forward with the project.[6] Accordingly, the trial court did not err in finding a causal connection between Fidelity's actions and Davis' harm.

Because the proposed development project was not illusory, Fidelity's delays caused Davis to delay the project, and expert testimony provided the sound basis for the determination of damages, we find no error in the award of lost profits. Even though precise calculation of damages was not possible due to the forced estimation of the starting point for those damages, the uncertainty was caused by Fidelity's actions. Accordingly, Fidelity cannot claim refuge from damages based on the uncertainty it created. The trial court's award of lost profits are based upon reasonable certainty and will not be disturbed.

_____

[6] Fidelity's position on lack of causality would essentially require Davis to ignore Fidelity's delays in the resolution of the claim and to proceed with only a fraction of the original project, to Davis' detriment, while exonerating Fidelity from the financial consequences of its actions.

Next, Fidelity raises two issues regarding the award of punitive damages. First, it claims the award is excessive under the due process clause, and second, attorney's fees were incorrectly included in the multiplied compensatory damages award. Neither issue has merit.

We begin by noting that Fidelity is not challenging the determination it acted in bad faith toward Davis. Rather, both issues challenge the amount of punitive damages awarded pursuant to that finding of bad faith.

In reviewing a challenge to the amount of an award of punitive damages, we are cognizant that:

> Under Pennsylvania law the size of a punitive damages award must be reasonably related to the State's interest in punishing and deterring the particular behavior of the defendant and not the product of arbitrariness or unfettered discretion. In accordance with this limitation, [t]he standard under which punitive damages are measured in Pennsylvania requires analysis of the following factors: (1) the character of the act; (2) the nature and extent of the harm; and (3) the wealth of the defendant.

> *Hollock*, *supra* at 419 (internal quotation marks and citations omitted). We review such an award for an abuse of discretion. *Id*. at 420. In addition, in the face of a constitutional challenge, we conduct a de novo review "to determine whether it comports with the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Id*.

> "Because punitive damages pose an acute danger of arbitrary deprivation of property, due process requires judicial review of the size of punitive damage awards." [*Pioneer Commercial Funding Corp. v. American Financial Mortg. Corp.*, 794 A.2d [269] at 292 [(Pa. Super. 2002), *reversed on other grounds*, 855 A.2d 818 (Pa. 2004)].]

- 8 -

In ***State Farm v. Campbell***, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 [2003], the United States Supreme Court reviewed a $145 million punitive damages award. Finding that the award was excessive and disproportionate to the wrong committed, the Court ruled it constituted an unconstitutional deprivation of the insurer's property. The Court noted that, although states possess discretion over the imposition of punitive damages, there are procedural and substantive constitutional limitations on these awards. ***Id***. at 1519. The Court cautioned that the due process clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments. ***Id***. at 1520. While finding that punitive damages are aimed at deterrence and retribution, ***id***. at 1519, the United States Supreme Court advised reviewing courts to consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." ***Id***. at 1520, (*citing **BMW of North America, Inc. v. Gore***, 517 U.S. 559, 560-61, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)).

The Court in ***Campbell*** reiterated that the "most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." ***Campbell***, 123 S.Ct. at 1521.

***Grossi v. Travelers Personal Insurance Company***, 79 A.3d 1141, 1157 (Pa. Super. 2013) *quoting **Hollock v. Erie Ins. Exch.***, 842 A.2d 409 (Pa. Super. 2004) (*en banc*).

Here, Fidelity does not challenge the application of the ***Hollock*** factors, but rather claims the award is excessive under the ***Campbell*** factors.

Initially, we note the trial court awarded Davis $393,227.31 in compensatory damages and $1,572,909.24 in punitive damages. This represents a 4:1 ratio of punitive to compensatory damages. The United States Supreme Court stated:

> We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In [**Pacific Mut. Life Ins. Co. v.**] **Haslip**, [499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)] in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. 499 U.S., at 23-24. 111 S.Ct. 1032. We cited that 4–to–1 ratio again in **Gore**, 517 U.S., at 581, 116 S.Ct. 1589. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. **Id**., at 581, and n. 33, 116 S.Ct. 1589. While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, **id**., at 582, 116 S.Ct. 1589, or, in this case, of 145 to 1.

**State Farm Mutual Automobile Insurance Company v. Campbell**, 538 U.S. 408, 425-26, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). Accordingly, at 4:1, there is nothing facially improper with the ratio between punitive and compensatory damages.

The degree of reprehensibility is the most important of the factors in assessing the appropriateness of punitive damages. Here, it can fairly be said, the trial court was appalled by Fidelity's conduct. The trial court found

Fidelity was aware of both the delay it caused Davis and likely consequences thereof. Final Memorandum and Order, 3/28/2014, at 11. In December 2007, shortly after Davis filed the claim, Fidelity notified Davis it was evaluating the claim and hoped to get back to him shortly. Memorandum and Order, 8/15/2013, Finding of Fact 14, at 4.[7] Approximately one year later, Fidelity notified Davis that Norella may have a valid claim to the 1.86 acres. FF. 15, at 4. Six months later, 20 months after the claim had been filed, Fidelity accepted Davis' claim and again stated it would contact Davis shortly regarding resolution of the claim. FF. 17, at 4. Fidelity waited another three months to hire counsel. FF. 18, at 4. Fidelity investigated the possibility of filing a quiet title action against Norella, but admitted there was scant chance of success. FF. 23, at 5. Nonetheless, Fidelity threatened Norella with filing the suit. CL. 22, at 14.

By August 2010, counsel for Fidelity was warning Fidelity of the possibility of bad faith. FF. 24, at 5. Davis repeatedly made inquiry about the status of his claim. CL. 24, at 14. Fidelity breached its own contract by failing to act diligently, failing to pay the loss within 30 days of fixing the

---

[7] All citations to findings of facts (FF) or conclusions of law (CL) are taken from the August 15, 2013 Memorandum and Order. Additionally, the trial court did not issue omnibus findings of fact and conclusions of law, rather, they were broken down into sub-categories, not always specifically labeled as findings or conclusions. For ease we refer to all citations as either FF or CL. Rather than clutter this memo with sub-category titles, we will cite to the FF or CL number and the page on which it is found.

amount and failing to act in good faith and fair dealing. FF. 8, at 17. It failed to follow its own internal claims handling procedures. FF. 13, at 18. Fidelity violated 31 Pa. Code 146.6 and 146.5(c) regarding prompt investigations of claims and communications with clients, as well as Pennsylvania Statutes 40 P.S. 1171.5(a)(10)(ii),(v) regarding communications with clients and failure to affirm or deny claims promptly. FF. 15, 16, 17, at 18-19. Fidelity made no offer to either Norella or Davis until after Davis filed the instant bad faith claim. FF. 36, at 7. Indeed, it is difficult to find an area in which Fidelity acted in conformance with accepted statutory, regulatory or internal standards.

As stated, reprehensibility of actions is the "most important indicium", **Campbell**, **supra**, in determining reasonableness of the punitive damage award. Degree of reprehensibility is determined by examination of several factors. **See Campbell**, **supra**; **Gore**, **supra**.[8] Fidelity is correct that some of the factors to consider in determining reprehensibility are inapplicable here. The harm was economically rather than physically injurious and there is no indication that such behavior is part of a greater pattern of indifference to its policyholders. Although the parties agreed Fidelity did not intentionally

---

[8] Factors include: physical or economic harm; indifference or reckless disregard to health or safety; affirmative acts; financially vulnerable victim; repeated actions. Case law provides no instructions regarding the application of these factors. Therefore, we conclude the weight given to each factor is case specific and based upon the discretion of the fact-finder.

harm Davis, the record clearly demonstrates a reckless indifference to the rights of Davis, and a five-year pattern of inaction, characterized by repeatedly ignoring the warnings of counsel and requests by its insured. In light of the overwhelming evidence against Fidelity, we find the trial court's determination of a high degree of reprehensible behavior to be supported by the record and therefore represents no abuse of discretion.

We believe the factual scenario of the instant matter is similar to that found in **Grossi v. Travelers**, **supra**, wherein the insurer's bad faith was limited to the claim at issue, as opposed to being part of a larger scale pattern of bad faith behavior toward multiple insureds. However, the bad faith consisted of repeated failings in addressing the insured's underinsured motorist claim. The reprehensibility of Travelers' actions outweighed other considerations and supported a $1,252,325.00 punitive damage award. This award represented a punitive damage to compensatory damage ratio of between 4:1 and 5:1.

Finally, Fidelity argues the trial court improperly included attorney's fees in the compensatory damage award that was quadrupled to arrive at the punitive damages amount. Fidelity has provided no authority for this position.[9] Additionally, we note that attorney's fees are specifically included

---

[9] Fidelity cited **Hollock v. Erie Insurance Exchange**, 842 A.2d 409, 421 (Pa. Super. 2004)(*en banc*). However, all judges in the *en banc* panel,
*(Footnote Continued Next Page)*

as compensatory damages in the bad faith statute. *See* 42 Pa.C.S. § 8371(3). Multiple cases have included attorney's fees in compensatory damages. *See Hollock*, *supra*; *Birth Center v. St. Paul Companies, Inc.*, 787 A.2d 376 (Pa. 2001); *Willow Inn, Inc. v. Public Service Mut. Ins. Co.*, 399 F.3d 224 (CA3 2005). Accordingly, we reject Fidelity's statement that attorney's fees must be removed from the punitive damages calculation. Fidelity has provided no other indication of how the trial court abused its discretion in including attorney's fees as compensatory damages, and our independent review finds no abuse of discretion.

Because the trial court's decision is supported by the certified record and free from abuse of discretion or error of law, we affirm.

Judgment affirmed.[10]

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/18/2015

*(Footnote Continued)* ———————————

including the two dissenting judges, agreed that attorney's fees were appropriately included in the compensatory award.

[10] In the event of future proceedings, the parties are directed to attach copies of Final Memorandum and Order on [Fidelity's] Motion for Post-Trial Relief, 3/28/2014, Memorandum and Order, 8/15/2013 (including findings of fact), and Stipulated Undisputed Facts, Joint Pre-Trial Order, 12/17/2012.

586a

RICHARD DAVIS and
MARIA DAVIS,

    Plaintiffs

  -vs-

FIDELITY NATIONAL TITLE
INSURANCE COMPANY,

    Defendant

:IN THE COURT OF COMMON PLEAS
:  OF LACKAWANNA COUNTY
:
:
:   CIVIL ACTION - LAW
:
:
:   JURY TRIAL DEMANDED
:
:
:
:    10 CIV 8868
:

JOINT PRE-TRIAL ORDER

1. Lacka.Co. R.C.P. 212(g) Conference of Counsel:

    a. Date of Conference: _November 30, 2012 Mediation before Thomas_
                              Helbig, Esq. Mediation discussions continue
    b. Names of counsel participating:

    Attorney for Plaintiff
    _Carl J. Guagliardo. Plaintiffs, Richard and Maria Davis also attended_

    Attorney for Defendant/Additional Defendant
    _Scott M. Rothman. Defendant representative Cyntia Baines_
    _also attended_

2. Lacka. Co. R.C.P. 238 Confirmation of Settlement Offer and Response

    a. Date and amount of settlement offer(s):
        _N/A - Breach of Contract and Bad Faith Action. Rule 238 does_
        _not apply_

    b. Date and substance of response to settlement offer(s)

5

3. Comprehensive Written Stipulation of All Uncontested Facts:
(To be read to the jury at the outset of trial).

SEE ATTACHED
_____
_____
_____
_____
_____
_____
_____
_____
_____

4. Witnesses to be Called at Trial (NOTE: Only those witnesses identified in the pre-trial order will be permitted to testify at trial):

*For the Plaintiff(s):* 1. Richard Davis; 2. Maria Davis; 3. Ben Bartek; 4. Ray Abrams; 5. Michael Coughlin; 6. David Tomaine; 7. Daniel Penetar; 8. Keith Weller; 9. William Rebar; 10. Jean Black; 11. Owen Girard; 12. Defendant Corporate Designee; 13. E.P. Mancinelli

(Attach additional sheets if necessary.)

*For the Defendant(s):*   SEE ATTACHED.
_____
_____
_____
_____

(Attach additional sheets if necessary.)

5. Schedule of Exhibits: (NOTE: Only those exhibits which are identified in the pre-trial order may be used or admitted into evidence at trial):

*For the Plaintiff(s) (Indicate whether the parties' stipulate to its admissibility, and if not, state the grounds for objection):*
#1: _____ SEE ATTACHED LIST _____
#2: _____
#3: _____
#4: _____
#5: _____
#6: _____
#7: _____
#8: _____
#9: _____
#10: _____

6

Circulated 02/27/2015 02:49 PM

#11: _____
#12: _____

*For the Defendant(s) (Indicate whether the parties' stipulate to its admissibility, and if not, state the grounds for objection):*
#1: _____
#2: _____
#3: _____
#4: _____
#5: _____
#6: _____
#7: _____
#8: _____
#9: _____
#10: _____
#11: _____
#12: _____

6. Statement of Facts and Legal Issues:
   a. Plaintiff's version of the facts and statement of legal issues
      On October 15, 2007 Plaintiffs filed a title insurance claim with Defendant related to a 1.86 acre parcel of land plaintiffs purchased in 2004. Plaintiffs learned they were not the true owners of the land shortly before filing the claim. Defendant acknowledged the claim on October 24, 2007 and notified Plaintiffs on June 18, 2009 that it had completed its investigation and accepted the claim. Thereafter, Defendant took no reasonable measures to resolve the claim and engaged in a course of conduct that was self-serving and dishonest. Plaintiffs filed the subject bad faith/breach of contract suit on December 14, 2010. Defendant ultimately resolved the title insurance claim by securing title to the property in the name of the Plaintiffs on August 14, 2012, nearly 5 years after the claim was opened.

      Legal issues have been briefed via Motion in Limine and Plaintiff will file trial brief
   b. Defendant's version of facts and statement of legal issues (continued, see attached

      SEE ATTACHED.
      _____
      _____
      _____
      _____
      _____
      _____
      _____
      _____

7. Trial Deposition

| Name of Witness | Date of Deposition | Length of Deposition | Party offering Deposition Testimony |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

8. Estimated Number of Trial Days (NOTE: The Court will strictly enforce the parties' estimated trial time): _____ Three _____ Day(s).

9. Any Additional Issues Which Should be Considered to Facilitate the Settlement or Trial of this Matter:

_____

_____

_____

SCOTT ROTHMAN
Attorney for ~~Plaintiff(s)~~ Defendant

Attorney for ~~Defendant(s)~~
PLAINTIFFS

8

Circulated 02/27/2015 02:49 PM

AND NOW, this _____ day of _____, _____, the Parties' jointly submitted Pre-Trial Order is hereby approved and shall govern the Trial of this case.

BY THE COURT:

_____ J.

JUDGE CARMEN D. MINORA

Circulated 02/27/2015 02:49 PM

Carl J. Guagliardo, Esq.
SELINGO GUAGLIARDO, L.L.C.
345 Market Street
Kingston, PA 18704
(570) 287-2400
Attorney I.D. No. 68876
Counsel for Plaintiff

| | |
|---|---|
| RICHARD DAVIS and<br>MARIA DAVIS,<br>        Plaintiffs,<br><br>vs.<br><br>FIDELITY NATIONAL TITLE<br>INSURANCE COMPANY, d/b/a<br>FIDELITY NATIONAL TITLE<br>INSURANCE COMPANY OF<br>NEW YORK<br>        Defendant. | IN THE COURT OF COMMON<br>PLEAS OF LACKAWANNA COUNTY<br><br><br>CIVIL ACTION – LAW<br>JURY TRIAL DEMANDED<br><br><br><br><br><br>No. 10 – CV - 8868 |

## STIPULATED UNDISPUTED FACTS

1.    Defendant, through its authorized agent, Daniel Penetar, Esq., issued a title insurance policy to Plaintiffs on October 29, 2004. (*Complaint/Answer ¶4, 5, and policy*).

2.    The policy insured an approximate 15 acre parcel of land in Carbondale Twp., Lackawanna County, Pennsylvania (*Policy*).

3.    Plaintiffs planned to develop the 15 acre parcel of land for residential housing, in the nature of both one-half acre parcels for individual homes and a "garden section" containing three, four-unit townhouses which would be offered for sale to the public. (*R. Davis dep. p. 31-32*).

4.    Daniel L. Penetar, Jr., Esquire, counter-signed the policy as the authorized agent of Defendant and also served as counsel for Plaintiffs with respect to the subject purchase of land.

1

Circulated 02/27/2015 02:49 PM

5. The "garden section" containing the townhouses was to be developed on a 1.86 acre portion of the property. (*R. Davis dep. p. 13*).

6. Prior to 2007, Mr. Davis purchased construction plans for the townhouses and hired an engineering firm to draft plans and drawings for the development (*R. Davis dep. p. 38-40*).

7. In 2007, Plaintiff, Rick Davis, attended a Carbondale Twp. Zoning board meeting to request a zoning special exception that would accommodate the townhouse development. (*R. Davis dep. p. 13*).

8. At the zoning hearing, a neighboring property owner, Louis Norella, objected on the basis that he was the owner of record of the 1.86 acre parcel. (*Id.*).

9. On October 15, 2007 Mr. Davis filed a title insurance claim with Defendant as related to a possible defect in his title to the 1.86 acre parcel of land. (*Davis letter dated Oct. 15, 2007*).

10. The handbook for adjustment of claims provided by Defendant to Plaintiff during discovery in this matter applied to adjustment of the Davis claim.

11. On June 18, 2009) Defendant completed its coverage investigation of the Davis claim. (*Def. letters dated Oct. 24, 2007 and June 18, 2009*).

12. On September 15, 2009, Defendant hired Michael Coughlin, Esquire to evaluate the merits of filing a Quiet Title Action. (*Discovery docs. 297-298; 220-221; 300; and 280-281*).

13. On January 20, 2010, Defendant obtained a legal research memo related to its options to resolve the claim as well as the merits of a quiet title action. (*Discovery doc. 163-164*).

14. Defendant obtained DIV appraisals on March 20, 2010. (*Defendant DIV appraisals*).

2

15.     In July, 2010, the Defendant attempted to "negotiate a settlement" with the Neighbor for the purchase of the 1.86 acres. (*Discovery document 00055*).

16.     Regarding the option to file a quiet title action to resolve the claim, Defendant knew (and documented on April 28, 2010) that such an action would likely be defeated if defended because there existed a notice/service defect in an earlier 1963 quiet title action for the subject property. (*Discovery doc. 0005*).

17.     Necessary subdivision approval was obtained about nine months later on June 7, 2012 and the subject property was thereafter conveyed to Plaintiffs on or about August 6, 2012. (*Deed*).

18.     On August 27, 2010 Defendant's retained counsel, Michael Coughlin, Esquire, wrote the following to Defendant Claims Attorney Benjamin Bartek:

> *"Ben, any word on this? The insured called me once again to find out how we intend to proceed. This claim has been hanging around for an extremely long period of time and I am concerned that the insured may opt to sue us for bad faith if we don't take some action relatively soon."*

(*Discovery doc. Nos. 0054 and 0053*).

19.     On December 13, 2010, the Defendant placed the first payment authority for settlement or resolution of this claim. *Def. discovery document number 0094*).

20.     This suit was commenced on December 14, 2010. (*Complaint*).

21.     Defendant's first written settlement offer to Mr. Norella (the property owner of record) was made on December 14, 2010. (*Dec. 14, 2010 letter from M. Coughlin to L. Norella*).

22.     On November 22, 2010 Mr. Tomaine called Defendant's retained counsel, Mr. Coughlin, to discuss status of the Davis claim. (*Coughlin billing records, Nov. 22, 2010*).

23.     Mr. Coughlin had contact with Defendant's "Operations" attorney, Keith Weller, on December 9, 2010 (a Thursday). (*Coughlin billing record Dec. 9, 2010*).

Circulated 02/27/2015 02:49 PM

24. Mr. Weller contacted Raymond Abrams of Defendant's Omaha, Nebraska claims center on or about December 13, 2010. (*Discovery doc. 00096*).

25. Mr. Abrams testified that the litigation that was attempting to be avoided was the Quiet Title Action against Mr. Norella. (*Abrams dep. p. 43, lines 19-24*).

26. On December 13, 2010 Mr. Abrams granted $25,000 settlement authority on this claim without a case assessment report (CAR) having been done. (*Discovery doc. 00094*).

27. Generally, though not always, a CAR is required to be done before settlement authority may be placed on a file. (*Abrams dep. p. 39, line 14-15*).

28. Prior to December 13, 2010, no amount of settlement authority had been placed on the Davis claim. (*Abrams dep. p. 50, lines 10-14*).

29. Defendant's claims manual provides the following:

> *"Insurer's Response to Tender of Claim; Investigation. . . ."*

> *"Response by the insurer to the claimant should be timely. The claims administrator should follow the requirements of the applicable statutes and regulations regarding acknowledgment of receipt of an insured's claim; completion of investigation; and notification of the title company's decision regarding coverage. Some state regulatory schemes provide specific timelines, while others simply require that the insurer's response occur in a reasonable time."*

(*Relevant portions of Fidelity Claims Handbook, document 0499, 0500, 0501*).

30. Claims attorney Benjamin Bartek was hired by the defendant in February, 2010. (*Bartek dep. P. 6, line 10*).

31. Prior to being employed by the Defendant, claims attorney Benjamin Bartek had no prior title claims experience. (*Bartek dep. p. 6, lines 9-23*).

32. After two weeks on the job he was handed the Davis claim along with approximately 39 others. (*Bartek dep. P. 7, line 17 through p. 8 line 25*).

33. Bartek was solely responsible for the approximately 40 files he was initially given. *(Bartek dep. P. 9, lines 1-5).*

34. Mr. Bartek's case load was eventually increased to approximately 160 files. *(Bartek deposition, p. 8 lines 6 through 25).*

35. On November 7, 2012, the Carbondale Twp. Zoning Board granted Plaintiffs' request for special exception, in accordance with Carbondale Twp. zoning law, to construct three, four-unit townhouses on the parcel of property that is the basis of this lawsuit.

36. No appeal of the November 7, 2012 special exception, described in paragraph 131, has been filed.

37. Defendant selected and paid Michael Coughlin, Esq. as retained counsel for the Davis title claim.

SELINGO GUAGLIARDO

BY: _____
CARL J. GUAGLIARDO, ESQ.
Selingo Guagliardo
345 Market Street
Kingston, PA 18704
Pa. Supreme Court No. 68876
Attorney for Plaintiff

1776a

RICHARD DAVIS and MARIA DAVIS,

        Plaintiffs,

    vs.

FIDELITY NATIONAL INSURANCE COMPANY, d/b/a FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK,

        Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

THE COURT OF COMMON PLEAS OF LACKAWANNA COUNTY

CIVIL ACTION - LAW

NO. 2009-CV-6154

## MEMORANDUM AND ORDER

MINORA, J.

### I.    INTRODUCTION AND PROCEDURAL POSTURE

Before the Court is an insurance bad faith and breach of contract action arising out of a title insurance policy that was issued by Defendant, Fidelity National Insurance Company, to Plaintiffs, Richard and Maria Davis, on October 29, 2004. The insurance policy insured a parcel of property upon which Plaintiffs proposed to build a residential development consisting of twelve townhouses comprised of three, four-unit townhouse buildings and 32 single family homes. The townhouses were to be built on a 1.86 acre triangular portion of the property. It was the ownership of this 1.86 acre piece of property that came into dispute and for which the title insurance claim was made.

The parties proceeded to a bench trial before this Court on January 29, 30 and 31, 2013. Both parties waived their right to a jury trial on the contract action and agreed that this Court would serve as the fact-finder for both the bad faith and contract counts.

1

1777a

The factual findings set forth below have been established by clear and convincing evidence and are based upon the testimony and evidence, which this court has found to be competent, credible, relevant and admissible in this case.

## II.    GENERAL FINDINGS OF FACT

(1)    The Defendant, through its authorized agent, Daniel Penetar, Esq., issued a title insurance policy to Plaintiffs on October 29, 2004. *Stip. Fact 1.*

(2)    The policy insured an approximate 15 acre parcel of land in Carbondale Twp., Lackawanna County, Pennsylvania. *Stip. Fact 2.*

(3)    Daniel L. Penetar, Jr., Esquire, counter-signed the policy as the authorized agent of Defendant and also served as counsel for Plaintiffs with respect to the subject purchase of land. *Stip. Fact 4.*

(4)    Plaintiffs planned to develop the 15 acre parcel of land for residential housing, in the nature of both one-half acre parcels for individual homes and a "garden section" containing three, four-unit townhouses all of which would be offered for sale to the public. *Stip. Fact 3.*

(5)    The "garden section" containing the townhouses was to be developed on the disputed 1.86 acre portion of the property. *Stip. Fact 5.*

(6)    Prior to 2007, Mr. Davis purchased non-sealed construction plans for the townhouses and hired an engineering firm to draft plans and drawings for the subdivision of the development. *Stip. Fact 6; Pltf. Exh. 25 –* "HICKORY PLANS."

2

1778a

(7) The size of each of the twelve townhouses was to be approximately 1,100 square feet, not including an indoor, single-car garage. *N.T. Vol. I, p. 37-38.*

(8) In 2007, Plaintiff, Rick Davis, attended a Carbondale Twp. Zoning board meeting to request a zoning special exception that would accommodate the townhouse development. *Stip. Fact 7.*

(9) At that same zoning hearing, a neighboring property owner, Louis Norella, objected on the basis that he was the proper owner of record of the 1.86 acre parcel. *Stip. Fact. 8.*

(10) At that time, the zoning board could not approve Plaintiff's request until it was determined who actually owned the disputed portion of the land. *N.T. Vol. I, p.42.*

(11) On October 15, 2007, Mr. Davis timely filed a title insurance claim with Defendant as related to a possible defect in the title to the 1.86 acre parcel of land. *Stip. Fact 9.*

(12) Receipt of Mr. Davis' claim was acknowledged by Defendant by letter dated October 24, 2007. *Pltf. Exh. 2, doc. No. 336.*

(13) On November 8, 2007 Defendant's title agent, Daniel Penetar, Esquire, notified Defendant that although he did perform a title search prior to issuing the Davis title policy, he did not include a search of the Norella chain of title. Once the dispute was brought to his attention he searched the Norella deed and it did appear to include the disputed piece of property. *Pltf. Exh. 2, doc. No. 251.*

3

(14) By letter dated December 13, 2007, Defendant notified Mr. Davis that it was in the process of evaluating his claim and hoped to get back to him "shortly." *Pltf. Exh. 2, doc. No. 334.*

(15) On December 10, 2008, Attorney Penetar again wrote to Defendant and explained that he and the surveyor the Defendant hired concluded that the disputed area is, and always has been, included in the Norella title. The same letter explained that the Davis' source of title traced back to a 1963 Quiet Title Action, which was defective due to lack of proper service upon the rightful land owner. *Pltf. Exh. 2, doc. No. 253-254.*

(16) On January 10, 2009, Defendant claims representative, Joseph Rejent, noted that the surveyor concluded that the insured did not own all the land he thought he owned and that one of the parcels purchased by the insured "came out of a Quiet Title Action which now appears to be faulty." *Pltf. Exh. 2, doc. No 011.*

(17) On June 18, 2009, Defendant completed its coverage investigation of the Davis claim. Defendant notified Plaintiff that there were no relevant policy exceptions or exclusions; that it was accepting the Davis claim; and that they would contact Mr. Davis shortly about resolution of the claim. *N.T. Vol. I, p. 45 and Pltf. Exh. 2, doc. No. 265.* Temporally, this is approximately one year and eight months after Plaintiff originally filed his claim on October 15, 2007.

(18) On September 15, 2009, Defendant hired Michael Coughlin, Esquire to evaluate the merits of filing a Quiet Title Action. *Discovery docs. 297-298; 220-221; 300; and 280-281.* This was three months after accepting the claim.

4

(19) On January 20, 2010, Defendant obtained a legal research memo related to its options to resolve the claim as well as the merits of a quiet title action. *Stip. Fact 13.*

(20) From March 2010 through October 2010, Mr. Davis repeatedly inquired into the status of his claim, however he did not receive a response from Defendant. *N.T. Vol. I, p. 51-56.* This time period ending on October 7, 2010 is approximately three years after Plaintiff's October 15, 2007 claim was filed.

(21) Defendant obtained dimunition in value (DIV) appraisals on March 20, 2010. *Defendant DIV appraisals.*

(22) In July 2010, the Defendant attempted to "negotiate a settlement" with the Neighbor for the purchase of the 1.86 acres. *Stip. Fact 15.*

(23) Regarding the option to file a quiet title action to resolve the claim, Defendant knew (and documented on April 28, 2010) that such an action would likely be defeated if defended because there existed a notice/service defect in an earlier 1963 quiet title action for the subject property. *Stip. Fact 16.*

(24) On August 27, 2010 Defendant's retained counsel, Michael Coughlin, Esquire, wrote the following to Defendant Claims Attorney Benjamin Bartek:

> "Ben, any word on this? The insured called me once again to find out how we intend to proceed. This claim has been hanging around for an extremely long time and I am concerned that the insured may opt to sue us for bad faith if we don't take some action relatively soon." (*emphasis added*)

*Stip. Fact 18.*

(25) Mr. Davis hired David J. Tomaine, Esquire, and instructed Mr. Tomaine to give Defendant a deadline for resolution of the claim. *N.T. Vol. I., p. 57.*

5

(26)   On November 22, 2010, Mr. Tomaine called Defendant's retained counsel, Mr. Coughlin, to discuss status of the Davis claim. *Stip. Fact 22.*

(27)   Mr. Coughlin had contact with Defendant's "Operations" attorney, Keith Weller, on December 9, 2010. *Stip. Fact 23.*

(28)   The present lawsuit was commenced on December 14, 2010. *Stip. Fact 20.*

(29)   On December 13, 2010, the Defendant placed the first payment authority for settlement or resolution of this claim. *Stip. Fact 19.* Three years and two months after the claim was filed, while threat of suit was pending.

(30)   Mr. Weller contacted Raymond Abrams of Defendant's Omaha, Nebraska claims center on or about December 13, 2010. *Stip. Fact 24.*

(31)   Mr. Abrams testified that the litigation that was attempting to be avoided was the Quiet Title Action against Mr. Norella. *Stip. Fact 25.*

(32)   On December 13, 2010 Mr. Abrams granted $25,000 settlement authority on this claim without a case assessment report (CAR) having been done. *Stip. Fact 26.*

(33)   Generally, though not always, a CAR is required to be done before settlement authority may be placed on a file. *Stip. Fact 27.*

(34)   Prior to December 13, 2010, no amount of settlement authority had ever been placed on the Davis claim. *Stip. Fact 28.*

(35)   Defendant's claims manual provides the following:

> "Insurer's Response to Tender of Claim; Investigation..."

> "Response by the insurer to the claimant should be timely. The claims administrator should follow the requirements of the applicable statutes and regulations regarding acknowledgment of receipt of an insured's claim; completion of investigation; and notification of the title company's decision regarding coverage. Some state regulatory schemes

6

provide specific timelines, while others simply require that the insurer's response occur in a <u>reasonable time</u>." (*emphasis added*)

*Stip. Fact 29.*

(36) Defendant's first written settlement offer to Mr. Norella (the property owner of record) was made on December 14, 2010. *Dec. 14, 2010 letter from M. Coughlin to L. Norella.* This was the same day the lawsuit was filed.

(37) On December 14, 2010, Plaintiff commenced the subject breach of contract and bad faith lawsuit. *N.T. Vol. I, p. 59 and Complaint.*

(38) On January 6, 2011, Defendant tendered payment to Plaintiffs in an amount equal to the $20,000 DIV; however, Plaintiffs did not accept the payment as this suit had already been filed. *Pltf. Exh. 5; D.T. 59:12 to 59:21.*

(39) Plaintiffs' claim was resolved with Defendant agreeing to pay the owner of the disputed property $50,000.00 (Fifty Thousand Dollars) and transfer title in Plaintiffs' names in August 2012. *N.T. Vol. I, p. 64-65.* Defendant also hired counsel to effectuate a subdivision approval of the Property and a surveyor to prepare the necessary plans. *R.T. 153:21 to 154:1; D.T. 64:18 to 65:3; Testimony of George Broseman ("G.T.") 102:7 to 102:18; 106:6 to 106:14.* This resolution occurred fifty eight (58) months after the original claim was filed by Plaintiff; nearly five years!

(40) On November 7, 2012, the Carbondale Twp. Zoning Board granted Plaintiffs' request for special exception, in accordance with Carbondale Twp. zoning law, to construct three, four-unit townhouses on the parcel of property that is the basis of this lawsuit. *Stip. Fact 35.*

(41) No appeal of the November 7, 2012 special exception has been filed. *Stip. Fact 36.*

(42) Defendant's title insurance policy provides that claims are resolved either by paying, or otherwise settling with, other parties for or in the name of an insured claimant, or by paying the loss to, or otherwise settling with, the insured claimant. *Policy, Pltf. Exh. 1, ¶ 6.*

(43) Pursuant to the Policy, Defendant therefore had the option to (a) attempt to cure the title defect by filing a quiet title action, or negotiate with the Norellas to convey the 1.86 acre disputed parcel to the Plaintiffs, or (b) pay the loss as defined by the policy, which is the lesser of the policy limits or the diminution in value (DIV) of the property as a result of the title defect. *Policy, Pltf. Exh. 1, ¶ 6.*

(44) Under the Policy, "The liability of the Company shall not exceed the least of: (i) The Amount of Insurance stated in Schedule A; or, (ii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by [the Policy]." *Policy, Pltf. Exh. 1, ¶ 7(a).*

### III. GENERAL CONCLUSIONS OF LAW

#### (A) LIABILITY

(1) In the present case, there were several known legal duties and fiduciary obligations recklessly disregarded by Fidelity, namely extraordinary delay in adjusting and resolving the claim, repeated violations of the Unfair Insurance

8

Practices Act and Unfair Claims Practices Act, failure to adequately train and supervise its employees, failure to follow its own claims handling guidelines, failure to make a timely offer of settlement, and elevating its own interest above the interest of its insured, among other duties.

(2) As defined by Black's Law Dictionary, bad faith occurs through an insurance company's unfounded (though not necessarily fraudulent) refusal to provide coverage in violation of the duties of good faith and fair dealing owed to an insured. *Terletsky v. Prudential Property and Cas. Ins. Co.*, 437 Pa.Super 108, 124, 649 A.2d 680, 688 (1994); *Black's Law Dictionary (9th ed. 2009)*.

(3) In a typical §8371 bad faith action against an insurer, Plaintiffs must be able to demonstrate both elements of a two-part test by "clear and convincing" evidence. The test is: (1) the insurer lacked a reasonable basis for denying coverage; and (2) the insurer knew or recklessly disregarded its lack of a reasonable basis. *Adamski*, 738 A.2d at 1036.

(4) It is this Court's conclusion of law that the Defendant, insurer, acted in bad faith and its chronic dilatory conduct embodied reckless disregard toward its insured from the time the claim was filed on October 15, 2007 until the time that the claim was finally resolved in August of 2012.

(5) It is the further conclusion of law of this Court that punitive damages are appropriate given the reckless disregard of the rights of the Plaintiffs, its own first party insured, by Defendant Fidelity.

(6) Section 8371 of the Judicial Code governs bad faith actions against an insurer by its insured, and provides:

9

1785a

"In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court <u>may take all of the following actions</u>:

"(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3 percent."

"(2) Award punitive damages against the insurer."

"(3) Assess court costs and attorneys' fees against the insurer."

42 Pa.C.S. §8371. *(emphasis added)*

(7)     The bad faith statute "authorizes courts, which find that an insurer has acted in bad faith toward its insured, to award punitive damages, attorneys' fees, interest and costs." *Birth Center v. St. Paul Companies Inc.*, 567 Pa. 386, 403, 787 A.2d 376, 386 (2001). *(emphasis added)*

(8)     Section 8371 does not define what conduct constitutes bad faith and the appellate courts have cautioned that "the breach of the obligation to act in good faith cannot be precisely defined in all circumstances." *Zimmerman v. Harleysville Mutual Insurance Co.*, 860 A.2d 167 (Pa. Super. 2004).

(9)     Rather, bad faith claims "are fact-specific and depend on the conduct of the insurer vis-à-vis its insured." *Williams v. Nationwide Mutual Insurance Co.*, 750 A.2d 881, 887 (Pa. Super. 2000).

(10)    Decisional precedent has described bad faith conduct by an insurer as including "any frivolous or unfounded refusal to pay proceeds of a policy." *Bonenberger v. Nationwide Mutual Insurance Co.*, 791 A.2d 378, 380 (Pa. Super. 2002); *Adamski v. Allstate Insurance Co.*, 738 A.2d 1033, 1036 (Pa. Super. 1999), *appeal denied*, 563 Pa. 655, 759 A.2d 381 (2000); *Williams, supra*.

1786a

(11) Since the insurer's conduct in failing to pay a claim must import a dishonest purpose in order to be deemed bad faith, the insured is required to prove that the insurer breached its duty of good faith and fair dealing through some motive of self-interest or ill will. *Brown v. Progressive Insurance Co.*, 2004 WL 2002477, *7, ¶34 (Pa. Super. 2004); *O'Donnell v. Allstate Insurance Co.*, 734 A.2d 901, 905 (Pa. Super. 1999).

(12) Although mere negligence or bad judgment is insufficient to establish bad faith, it is not necessary for the insurer's refusal to be fraudulent. *Bonenberger, supra; Adamski, supra.* For that reason, "bad faith encompasses a wide variety of objectionable conduct." *Brown, supra* at *6, ¶31.

(13) By way of illustration, actions by the insurer which are violations of the Unfair Insurance Practices Act are considered to be bad faith conduct under Section 8371. *O'Donnell,* 734 A.2d at 906. Therefore, an insurer may be liable for bad faith if it fails to conduct a good faith investigation and neglects to communicate promptly with the insured. *Brown, supra* at *6, ¶31 (quoting *Romano v. Nationwide Mutual Fire Insurance Co.*, 435 Pa. Super. 545, 553-54, 646 A.2d 1228, 1232 (1994)).

(14) As the Superior Court of Pennsylvania has remarked:

> "Individuals expect that their insurers will treat them fairly and properly evaluate any claim they may make. A claim must be evaluated on its merits alone, by examining the particular situation and the injury for which recovery is sought. An insurance company may not look to its own economic considerations, seek to limit its potential liability, and operate in a fashion designed to 'send a message.' Rather, it has a duty to compensate its insureds for the fair value of their injuries. Individuals make payments to insurance carriers to be insured in the event coverage is needed. It is the responsibility of insurers to treat their insureds fairly and provide just compensation for covered claims based on the actual

11

damages suffered. Insurers do a terrible disservice to their insureds when they fail to evaluate each individual case in terms of the situation presented and the individual affected."

*Bonenberger*, 791 A.2d at 382.

(15) When considering the merits of a bad faith claim, "one must look at the behavior of the insurer toward the insured and measure its reasonableness ... to see whether it is perhaps more than mere negligence or bad judgment...." *Ash v. Continental Insurance Co.*, 593 Pa. 523, 932 A.2d 877 (2007).

(16) With respect to the present case, the evidence clearly shows that Fidelity did not have a reasonable basis for taking almost five (5) years to resolve Plaintiffs' claim. At virtually every stage of Defendant's claims review and adjustment there is a disturbing pattern of extraordinary chronic delay. See, *Findings of Fact,* ¶ 11-38.

(17) Defendant recognizes and readily acknowledges that it should have resolved Plaintiffs' title insurance claim more quickly. However, Defendant argues that its delay does not give rise to a claim for bad faith liability under 42 Pa. C.S. §8371 because Plaintiffs presented no evidence of any ill will, improper motive, or dishonest purpose as the cause of the delay. Defendant instead asserts that its actions merely amount to simple neglect of the claim and bad judgment, which they claim is not enough to trigger liability under §8371.

(18) An insurer can, in good faith, delay payment based upon information that it does not yet have. It is only if the delay was due to an evil motive or a reckless indifference to the rights of the insured that bad faith can be present. *Younis*

12

Circulated 02/27/2015 02:49 PM

*Bros. & Co., Inc. v. Cigna Worldwide Ins. Co.*, 882 F. Supp. 1468, 1470 (E.D. Pa. 1994). While not bound by this case we find its reasoning most persuasive.

(19) However, the present title insurance case is factually unique because Fidelity did not deny coverage. Instead, Fidelity took 20 months to complete its investigation and notify Plaintiffs that the claim was covered under their policy. See, *Findings of Fact*, ¶ 11, 13. Defendant then delayed payment for almost three years, only finally tendering an inadequate offer once suit was filed. See, *Findings of Fact*, ¶ 18, 30.

(20) This Court concludes that such an extreme delay can certainly constitute bad faith under 42 Pa.C.S. §8371, and it characterizes the inaction of the Defendant as being outrageous and recklessly indifferent to the rights of its insured, our Plaintiff. *Younis Brothers & Company*, supra.

(21) Fidelity knew of and was recklessly indifferent due to its lack of a reasonable basis for failing to resolve the Davis' claim during the nearly five (5) year period in question. Such reckless indifference can clearly be seen though Fidelity's repeated failure to respond to Davis' constant inquiries regarding the status of his claim. This reckless indifference is also illustrated in the correspondence between the Defendant claims attorney, Shawn Grimsley, Esq., and the Claims manager, Malachay Sullivan, on September 2, 2009, in which Mr. Grimsley conveyed his concerns regarding the extreme and unnecessary delay involved with the handling of the Davis' claim as well as the possibility that the insured "may opt to sue us for bad faith if we don't take some action relatively soon." *Pltf. Exh. 2, doc. No. 297-298*; *Pltf. Exh. 2, doc. No. 053*. This communication

13

marks the earliest definitive date, almost two (2) years post claim filing, when Defendant knew that it had no reasonable basis to continue to deny, by delay, the resolution of Plaintiffs' claim. Given this knowledge and their delay and lack of action one can only conclude Defendant's conduct is outrageous.

(22) Fidelity also displayed improper purpose in its delay such as ill will, improper motive, dishonesty or self-interest through its dealings with adjoining property owner Mr. Norella by knowingly threatening a meritless quiet title suit, and investigating his finances to determine whether he could afford to defend the quiet title action instead of settling the claim and making the insured whole. *Pltf. Exh. 14, Bartek dep. P. 43, ln 10-18.*

(23) A lengthy delay in payment owed by an insurer does not automatically constitute bad faith, since the delay could be due to negligence. *El Bor Corp. v. Fireman's Fund Ins. Co.*, 787 F. Supp. 2d 341, 349 (E.D. Pa. 2011). In *El Bor Corp. v. Fireman's Fund Ins. Co.*, delay in the processing of the claim, because the claim had "fallen through the cracks," did not constitute bad faith because the delay was not knowing or reckless, only negligent. Therefore, a seven-month delay in the processing of the insured's claim after receipt of the expert report did not constitute bad faith. *Id.*

(24) The length of Fidelity's delay in the present case greatly exceeds the seven-month delay in *El Bor Corp. v. Fireman's Fund Ins. Co.* Further, Fidelity was repeatedly reminded by Davis' numerous inquiries that his claim continued to remain outstanding and unresolved.

14

(25) There is sufficient credible evidence showing that the insurer's outrageous scheme and reckless indifference in turning a blind eye to Davis' claim hoping that it would somehow resolve itself backfired. Fidelity's self-serving, self-created position in retaining policy proceeds rightfully belonging to their insured, our Plaintiff, presents a gross and reckless indifference to the rights of the insured with whom they had a contractual relationship and arguably, a fiduciary relationship as well. *Hollock v. Erie Ins. Exchange*, 54 Pa. D. & C. 4th 449, 518 (Pa.Com.Pl. 2002). Fidelity's delay was not only due to negligence, but also because of reckless disregard of the Plaintiffs' rights, through its repeated attempts over nearly five years to find a cheaper way of escaping their liability to settle the claim, while the Davis' waited and watched their proposed subdivision languish.

## (B) COMPENSATORY DAMAGES TO INSURED

(1) "Consequential damages are generally understood to be other damages which naturally and proximately flow from the breach and include three types of lost profit damages: (1) lost primary profits; (2) lost secondary profits; and (3) loss of prospective profits, also commonly referred to as good will damages." *AM/PM Franchise Association v. Atlantic Richfield Co.*, 536 Pa. 110, 119, 584 A.2d 915 (Pa. 1990).

(2) However, statutorily, Plaintiffs cannot recover under 42 Pa. C.S. §8371 for any compensatory or consequential damages. *Birth Center*, 787 A.2d at 403. Courts applying §8371 have uniformly held that a successful plaintiff may only recover

15

the damages that are expressly provided by the statute: interest, court costs, punitive damages, and attorney's fees. *Id.* at 402-403.

(3) Compensatory damages may be awarded, however, under Pennsylvania common law, which has historically recognized the implied covenant of good faith and fair dealing in the context of insurance law. *Zaloga v. Provident Life and Acc. Inc. Co. Of America,* 671 F.Supp.2d 623, 630 (M.D. Pa. 2009).

(4) The general rule is that consequential damages are recoverable in contract and tort actions where (1) there is evidence to establish them with reasonable certainty; (2) there is evidence to show that they were the proximate consequence of the wrong; and (3) in contract actions, they were reasonably foreseeable. *Delahanty v. First Pennsylvania Bank, N.A.,* 318 Pa. Super. 90, 464 A.2d 1243, 1257 (1983).

(5) Plaintiffs' claims for compensatory damages are not limited solely to statutory bad faith claims under Section 8371. They also include a bad faith claim arising from Defendant's breach of the implied covenant of good faith and fair dealing, and therefore their claim for compensatory damages is proper. *Zaloga v. Provident Life and Acc. Inc. Co. Of America,* at 631.

(6) To prevail on a breach of contract cause of action under Pennsylvania law, a Plaintiff has the burden of showing the following: the existence of a contract, including its essential terms; a breach of a duty imposed by the contract; and damages to the Plaintiff as a result of the breach. *Core-States Bank v. Cutillo,* 723 A.2d 1053, 1058 (Pa. Super. 1999).

1792a

(7)    Pennsylvania law implies a duty of good faith into an insurance contract and the breach of such a duty constitutes a breach of the insurance contract. *Berg v. Nationwide*, 2012 Pa.Super. 88, 44 A.3d 1164, 1170 (2012), citing *Gray v. Nationwide*, 422 Pa. 500, 508, 223 A.2d 8, 11 (1966).

(8)    Here, the Plaintiffs assert that the Defendant breached the title insurance contract entered into between the parties in at least three respects: (1) In failing to fulfill its contractual obligations in a reasonably diligent manner due to taking almost five years to resolve the claim; (2) By failing to pay the loss within 30 days of fixing the amount thereof, as required by the terms of the contract (Pltf. Exh. 1, ¶12(a)); and, (3) By breaching their implied duty of good faith and faith dealing with its insureds, by, among other things: delaying resolution of the claim for nearly five years; repeatedly failing to communicate with its insureds about the claim, despite repeated requests for information; and by committing multiple violations of the Pennsylvania Unfair Insurance Practices Act and Unfair Claims Settlement Practices Regulations.

(9)    In addition to violation of Pennsylvania's Bad Faith statute, 42 Pa.C.S. §8371, this Court finds clear and convincing evidence of bad faith conduct by Defendant in the following:

(10)    Through Defendant's failure to make a timely offer of settlement. *Hollock v. Erie Ins. Exchange*, 54 Pa. D&C 4th (Luzerne 2002), affd' 842 A.2d 409 (Pa. Super. 2004) (the court held that bad faith conduct by an insurer may include the failure to make a reasonable offer of settlement). See also, *Klinger v. State Farm*, 115 F.3d 230 (3d. Cir. 1997).

17

(11)  Through Defendant's failure to manage and supervise the handling of the Davis claim. An insurer's failure to "efficiently, effectively, and professionally manage" its insured's claim may serve as a basis for bad faith. See, *Liberty Mutual Ins. Co. v. Paper Manufacturing Co.*, 753 F.Supp. 156, 159-160 (E.D. Pa. 1990) and *Adamski*, supra.

(12)  Through Defendant's elevating its own interest above that of its insured. An insurer must give the interests of its insured the same faithful consideration that it gives its own interests. *Hollock*, supra.

(13)  Through the Defendant's failure to follow its own internal claims handling guidelines (the failure of an insurance company to follow its own internal claims handling guidelines may be evidence of not having a reasonable basis for denying insurance benefits). *Galko v. Harleysville Pennland Insurance Co.*, 2005 Pa. D&C 4th 236 (Lacka. 2005).

(14)  It has also been held that an insurer can be held liable for bad faith where the insurer's assessment of a claim is "less than honest, intelligent and objective." *Puritan Ins. Co. v. Canadian Ins. Co.*, 775 F.2d 76 (3d Cir. 1985).

(15)  We must also look to the *Hollock* trial court's rendition of what constitutes bad faith where it adopts the guidelines set forth in the Unfair Insurance Practices Act, 40 P.S. §1171 et seq. and the Pennsylvania Code regulations for insurance practices, 31 Pa. Code § 146.1 et seq. Those segments that we find most applicable are set forth below:

(16)  Defendant violated 31 Pa. Code 146.6 – Standards for prompt investigation of claims, which requires an insurer to complete its investigation of a claim within

18

30 days after notification of claim, unless the investigation cannot reasonably be completed within the time. If the investigation cannot be completed within 30 days, and every 45 days thereafter, the insurer shall provide the claimant with a reasonable written explanation for the delay and state when a decision on the claim may be expected. Here Defendant took 20 months to complete its investigation, without the legally required communication and justification for such a delay. Despite Plaintiffs' constant efforts, Defendant did not communicate any explanation for the delay to its insured.

(17) Defendant repeatedly violated 40 P.S. 1171.5(a)(10)(ii) (failing to acknowledge and act promptly upon written or oral communication with respect to claims arising under insurance policies), and 31 Pa. Code §146.5(c) (Failure to acknowledge pertinent communications, requiring that that an appropriate rely shall be made within 10 working days on other pertinent communications from a claimant which reasonably suggest that a response is expected). Here Defendant routinely ignored Plaintiffs, who initiated repeated communications, with his insurer over a period of years.

(18) Defendant violated 40 P.S. 1171.5(a)(10)(v) -- Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed and communicated to the company or its representative. In support of this conclusion the Court adopts, by reference thereto, those conclusions of law related to Defendant's unreasonable basis to delay/deny Plaintiffs' claim, *supra*, as it fully set forth herein at length. See, *Findings of Fact*, 20, 24, 27, 37, etc.

19

1795a

(19) Defendant violated 40 P.S. 1171.5(a)(10)(vi) – "Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonably clear." In the present case, the testimony established that Defendant's liability under the policy was clear within months of the claim being filed. However, at no time prior to this lawsuit being filed on December 14, 2010, was a settlement offer made to Mr. Norella, the true owner of the land, or to the insureds, Mr. and Mrs. Davis.

(20) The unreasonable delay of nearly five years, along with multiple, and often repeated, violations of Pennsylvania law by Defendant leads the Court to conclude that the Defendant's conduct extended well beyond mere negligence or misjudgment and instead demonstrated bad faith, reckless indifference and outrageous conduct towards its insureds. This is especially so when it is noted above, that it took the filing of this lawsuit to finally motivate Defendant to authorize monetary authority on this claim and to resolve the dispute.

(21) The Plaintiffs have provided estimates for the increased costs of construction between 2007 and 2013, and the depreciation in market value of the townhouses. These numbers amount to $89,760.00 and $272,400.00 respectively. *N.T. Vol. I, p. 163; N.T. Vol. I, p. 232, 239-240 and Pltf. Exh. 39.*

(22) However, the Court finds that the futuristic appraisal numbers lack credibility and are therefore unpersuasive. The timeline for construction and the rollout and readiness of the units for market are not based upon any fixed construction schedule, nor is their completion and entry into the marketplace clearly

20

1796a

determined. We therefore exercise our discretion as fact finder and allow $135,000.00 for depreciation as well as $89,760.00 for Plaintiffs' increased construction costs.

## (C) PUNITIVE DAMAGES

(1)    Pennsylvania courts have established that a finding of bad faith against an insurer toward its insured was the only statutory prerequisite to punitive damages award in an action arising under an insurance policy pursuant to 42 Pa.C.S.A. §8371. *Hollock*, supra at 418.

(2)    It is well recognized that a determination of bad faith does not necessitate an award of punitive damages, but it does allow for an award of punitive damages without additional proof, subject to the trial court's exercise of discretion. *Id.*, at 419.

(3)    For the reasons set forth above, we find that Fidelity's bad faith conduct was clearly proven to be outrageous and egregious and displayed a reckless disregard toward the rights and interests of the Davis'. Therefore, the Davis' are entitled to an award of punitive damages under 42 Pa. C.S. §8371(a). *Adamski*, supra.

(4)    The Pennsylvania Superior Court concluded "the size of a punitive damages award must be reasonably related to the State's interest in punishing and deterring the particular behavior of the defendant and not the product of arbitrariness or unfettered discretion." *Shiner v. Moriarty*, 706 A.2d 1128, 1241 (Pa. Super. 1998).

(5)     Punitive damages are directed towards deterrence and retribution. *State Farm v. Campbell*, 538 U.S. 408, 419 (2003).

(6)     In assessing punitive damages, the trier of fact should consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause, and the wealth of the defendant. *SHV Coal Inc. v. Continental Grain Co.*, 526 Pa. 489, 493-94, 587 A.2d 702, 704 (1991).

(7)     A defendant's net worth has been recognized "as a valid measure of its wealth" for purposes of punitive damages. See *Sprague v. Walter*, 441 Pa. Super. 1, 61-63, 656 A.2d 890, 920 (1995).

(8)     Davis and Fidelity have stipulated through the admission of Plaintiff Exhibits 20, 21 and 22, that the Defendant's net worth between 2009 and 2011 ranged between $363, 555,922.00 and $528, 567, 433.00.

(9)     However, the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments, and mandates that the proportionality between the actual or potential harm suffered and the size of the punitive damages award is relevant. *State Farm v. Campbell*, at 424-426.

(10)    Although there is no "bright-line" test that a court can apply to ensure that the size of an award of punitive damages complies with due process, several factors are called into question, the Supreme Court has noted that "in practice, few awards exceeding a single-digit ratio will satisfy due process." *Id.* at 425; *Hollock*, supra at 421.

1798a

(11)   In analyzing the proportionality between the compensatory damages and the punitive damages, the amount of counsel fees and costs awarded is to be included in the compensatory damages figure. *Id.* at 421-422. Therefore, the total compensatory damages figure for the purpose of calculating punitive damages is:

> $89,760.00 - Increased Construction Costs
>
> $135,000.00 – Depreciation
> $158,450.00 – Attorney's Fees
> $10,017.31 – Litigation Costs and Expenses
> **Total Compensatory Damages: $393,227.31**

(12)   Given Fidelity's net worth (averaging $454,557,975.67 from 2009 through 2011, based on stipulation of the parties), a significant punitive damage award is necessary in order to deter Fidelity from engaging in similar misconduct towards other policy holders.

(13)   The significant harm caused to Plaintiffs in essentially stopping their business investment and development for years while Fidelity refused to act must also be considered in calculating punitive damages.

(14)   Taking all of the above factors into consideration we find that an appropriate multiplier is an award of four times the compensatory damages as rendered by this Court as $393,227.31. The total punitive damages award equals $1,572,909.24.

(15)   This approach is significant in terms of the insurer's wealth while it accounts for Defendant's continuing financial stability and will not destroy its operations.

**1799a**

Such an amount also operates as a deterrent to the Defendant, as well as other insurers in the future. *Shiner*, supra.

### (D) INTEREST

(1) A separate issue the Court is called to confront is the subject matter of interest as applied to compensatory damages as applicable under 42 Pa. C.S.A. § 8371.

(2) 42 Pa. C.S.A. §8371 prescribes that upon a finding of bad faith, by an insurer, a court may award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(3) The statute plainly states that interest should be applied to the amount of the claim from the date the claim was made. See 42 Pa.C.S.A. §8371(1).

(4) The date we shall assess as the date the claim was made is October 15, 2007 (See, *Findings of Fact* ¶ 11). This date marks the day that Richard and Maria Davis had filed a legitimate claim arising from their insurance policy. Therefore, we shall apply 3% above the prime rate of interest to the verdict in the underlying action of $224,760.00 payable by Fidelity National Insurance Company pursuant to 42 Pa. C.S.A. §8371(1).

(5) Pa. R.C.P. 238 lists the prime rates of interest for each year as set forth in the first edition of the Wall Street Journal for the purpose of assessing damages. Under Pa. R.C.P. 238, the prime rate of interest for the applicable years was 8.25% for 2007, 7.25% for 2008, and 3.25% for 2009 through 2013.

24

(6)     Therefore, calculating this interest rate plus 3%, the amount of interest due is to equal $96,610.04, which represents the period of October 15, 2007 through August 15, 2013.

| 2007 | 77 Days at 11.25% | $5,397.16 |
|------|-------------------|-----------|
| 2008 | 366 Days at 10.25% | $24,326.33 |
| 2009 | 365 Days at 6.25% | $14,494.49 |
| 2010 | 365 Days at 6.25% | $14,494.49 |
| 2011 | 365 Days at 6.25% | $14,494.49 |
| 2012 | 366 Days at 6.25% | $14,535.46 |
| 2013 | 226 Days at 6.25% | $8,867.62 |

## (E) ATTORNEY'S FEES

(1).    Pa.C.S. §8371 provides for the recovery of counsel fees and expenses "to compensate the plaintiff for having to pay an attorney to get that to which they were contractually entitled" and punitive damages "to punish the defendant for its bad faith in failing to do that which it was contractually obligated to do." *Klinger*, supra at 236.

25

(2) In the present case, attorney's fees and costs were admitted through stipulation of the parties in Plaintiffs' Exhibit 17 and Plaintiffs' Exhibit 18 respectively. *N.T. January 31, 2013, p. 97.*

(3) Plaintiffs' Exhibit 17 indicates that the reasonable value of said legal services is $158,450.00. *Pltf. Exh. 17.*

(4) This amount includes 633.8 service hours at $250.00 an hour. *Id.* The Court finds the amount of these legal fees to be reasonable and customary for our area.

(5) Plaintiffs' Exhibit 18 indicates that Plaintiffs' litigation costs and expenses from trial through the beginning of trial totaled $7, 392.31 and that Plaintiffs' litigation cost and expenses from trial through the current date totaled an additional $2,625. Therefore Plaintiffs' total litigation costs and expenses are $10, 017.31. As they are well documented the court accepts these costs and expenses as offered.

(6) This Court therefore finds the amount assessed for both attorney's fees to be a reasonable and acceptable fee, and the amount measured for litigation costs and expenses to be reasonable and acceptable.

(7) Therefore, our assessment of attorney's fees and cost will include an award to Richard Davis and Maria Davis in the amount of $168,467.31.

An appropriate Order follow

1802a

| | | |
|---|---|---|
| RICHARD DAVIS and MARIA DAVIS, | : | THE COURT OF COMMON PLEAS |
| Plaintiffs, | : | OF LACKAWANNA COUNTY |
| | : | |
| vs. | : | CIVIL ACTION - LAW |
| | : | |
| FIDELITY NATIONAL INSURANCE | : | |
| COMPANY, d/b/a FIDELITY | : | |
| NATIONAL TITLE INSURANCE | : | |
| COMPANY OF NEW YORK, | : | |
| Defendants. | : | NO. 2009-CV-6154 |

## ORDER

AND NOW, this 15th day of August 2013, upon consideration of the parties' verbal and written arguments of counsel and all testimony and evidence presented to the Court on January 29, 30 and 31, 2013 and in accordance with the preceding Memorandum it is hereby ORDERED AND DECREED as follows:

(1)     A verdict is entered in favor of the plaintiffs, Richard Davis and Maria Davis, and against the defendant, Fidelity National Insurance Co., pursuant to 42 Pa.C.S. §8371 based upon clear and convincing evidence that the defendant, Fidelity National Insurance Co., acted in bad faith toward its insureds, Richard Davis and Maria Davis, and pursuant to Plaintiffs' bad faith claim based upon clear and convincing evidence that Defendant breached its implied covenant of good faith and fair dealing towards the insured.

(2)     The Court finds that the Defendant, Fidelity National Insurance Company is liable for the verdict rendered, totaling $224,760.00 compensatory damages

27

1803a

(increased construction costs plus depreciation), in the underlying action, plus interest at the rate of 3% above the prime rate of interest from the date of October 15, 2007, the claim was made through August 15, 2013 equal to $96,610.04.

(3)     The Court awards attorney's fees and costs to Richard Davis and Maria Davis in the amount of $168,467.31.

(4)     The Court awards punitive damages against the Defendant, Fidelity National Insurance Company, in an amount of four times the total compensatory damages (increased construction costs, depreciation, attorney's fees, litigation costs and expenses) awarded by this Court equaling $1,572,909.24.

$96,610.04 simple interest 10/15/07 – 8/15/13

$1,572,909.24 punitive award (4 x total compensatory damages verdict)

$224,760.00 compensatory damages

$168,467.31 Davis' attorney's fees and costs

$2,062,746.59 Total verdict

(6)     Judgment is entered in the amount of $2,062,746.59 for the Plaintiffs.

BY THE COURT

_____ J.

CC: Written notice of entry of the foregoing Memorandum and Order has been

28

Circulated 02/27/2015 02:49 PM

*provided to each party pursuant to Pa.R.Civ.Pro. 236(a)(2) by mailing time stamped copies to:*

Attorney for Plaintiffs:
Selingo Guagliardo, LLC
Carl J. Guagliardo, Esq.
345 Market Street
Kingston, PA 18704

Attorney for Defendant:
Durkin and MacDonald, LLC
Lawrence A. Durkin, Esq.
108 N. Washington Avenue, Ste. 1000
Scranton, PA 18503

1988a

| RICHARD DAVIS and | : | THE COURT OF COMMON PLEAS |
| MARIA DAVIS | : | OF LACKAWANNA COUNTY |
| Plaintiffs | : | |
| | : | |
| v. | : | CIVIL ACTION-LAW |
| | : | |
| FIDELITY NATIONAL | : | 2010-CV-8868 |
| INSURANCE COMPANY, | : | |
| d/b/a FIDELITY NATIONAL | : | |
| TITLE INSURANCE COMPANY | : | |
| OF NEW YORK | : | |
| Defendants | : | |

## FINAL MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTION FOR POST-TRIAL RELIEF

MINORA, J.

### INTRODUCTION

Before the Court is Defendant Fidelity National Insurance Company (hereinafter

"Defendant")'s Motion for Post-Trial Relief seeking reconsideration of this Honorable

Court's August 15, 2013 Memorandum and Order. For the reasons that follow,

Defendant's Motion is denied and dismissed, and the Court's Non-Jury Decision filed

August 15, 2013 is affirmed in all respects.

### PROCEDURAL HISTORY

This Honorable Court's August 15, 2013 Memorandum and Order entered

judgment in favor of Plaintiffs and against Defendant in the amount of $2,062,746.59

pursuant to our finding of Defendant's breach of contract and statutory insurance bad

faith. Both parties filed Motions for Post-Trial Relief to the August 15, 2013 Order.

Plaintiff's motion, filed September 12, 2013, was denied and dismissed by this Court on

September 16, 2013.

1

Circulated 02/27/2015 02:49 PM

Defendant's Motion for Post-Trial Relief was filed September 2, 2013. While Defendant's Motion was pending in the trial court, Defendant filed a Notice of Appeal of the Order on September 12, 2013, the same day that Plaintiffs filed their Motion for Post-Trial Relief. On January 17, 2014, the Appeal was quashed by the Pennsylvania Superior Court since Defendant's post-trial motion remained pending before our Court.

Defendant's Brief in Support of its Motion for Post-Trial Relief and Plaintiffs' Brief in Opposition to Defendants' Motion were both filed December 23, 2013. Argument on Defendant's Motion was held January 14, 2014.

## DEFENDANTS' LEGAL ARGUMENT

Defendant moves for an Order granting a new trial with respect to all issues pursuant to Pa.R.C.P. 2227.1(a)(1), (2), (4), and (5), or in the alternative, for an Order entering judgment in Defendant's favor, or an Order modifying or changing the August 15, 2013 Order. Defendant alleges that the court's damages award of $2,062,746.59 is not supported by Pennsylvania law. Specifically, Defendant argues that the trial court applied the wrong standard in assessing Plaintiffs' claim of Defendants' bad faith and erred in awarding lost profits and punitive damages. Defendant's arguments are further described in the Legal Analysis section of this Opinion below.

## LEGAL STANDARD

### Post-Trial Motions Regarding Request for a New Trial

The filing and disposition of Defendant's Post-Trial Motion is governed by Pa.R.C.P. 227.1 entitled "Post-Trial Relief." The rule indicates at Pa.R.C.P. 227.1(a):

2

"After trial and upon the written motions for Post-Trial Relief filed by any party, the court may:

(1) Order a new trial as to all or any of the issues; or
(2) Direct the entry of judgment in favor of any party; or
(3) Remove a non-suit; or
(4) Affirm, modify, or change the decision, or
(5) Enter any other appropriate order.

Pa.R.C.P. 227.1(c) states that post-trial motions shall be filed within ten days after . . . (2) notice of nonsuit or the filing of the decision in the case of a trial without a jury. See Covalesky v. Covalesky, 2003-EQ-60069 at 2-3, (Lacka. Co. Jan. 14, 2014).

Regarding post-trial motions, trial courts possess broad discretion to grant or deny a new trial. Covalesky, 2003-EQ-60069 at 7; Harman v. Board, 562 Pa. 455, 465, 755 A.2d 1116 (2000). The granting or denial of a new trial can be an effective instrumentality for seeking and achieving justice in those instances where the original trial is proven to have failed to produce a just and fair result. Covalesky, 2003-EQ-60069 at 7 (citing Dornan v. McCarthy, 412 Pa. 595, 195 A.2d 520, 522 (1963); Harman, 562 Pa. at 466). Review of a denial of a new trial request requires the same analysis as a review of a grant of new trial. Covalesky, supra at 13 (citing Luzerne County Flood Protection Authority, 825 A.2d at 783-84). If support for a trial court's decision is found in the record, its' order must be affirmed. Randt v. Abex Corp., 671 A.2d 228, 448 Pa. 224 (Pa. Super. 1996).

In reviewing post-trial motions seeking a new trial, a court must begin with an analysis of the alleged underlying conduct or omission by the trial court that forms the basis for the request or motion. This analysis involves a two-step process. First, the court must decide whether one or more mistakes that implicate factual, legal, or discretionary matters may have occurred during trial. Second, if the court determines

3

than an error or mistake did occur, it must determine if the alleged mistake or error was so grievous as to provide a sufficient basis for granting a new trial. See Covalesky, *supra* at 8 (citing Harman, 562 Pa. at 467; Bey v. Sacks, 789 A.2d 232, 236 (Pa. Super. 2001); Luzerne Co. Flood Protection Authority v. Reilly, 825 A.2d 779 (Pa. Cmwlth. 2003).

A new trial is not warranted simply because an error may have occurred at trial or because another judge may have ruled differently. Covalesky, 2003-EQ-60069 *supra*, at 8. The moving party must prove they suffered some prejudice as a result of the error. Id. (citing Bey, 789 A.2d at 236). This analysis implicates the harmless error doctrine, which underlies every decision to grant or deny a new trial. Id. This is so because the court, being a human institution, cannot ever guarantee a perfect trial. Id. What it seeks to do is provide a trial free of reversible error concluding with a fair result. Id.

In our review of Defendant's Motion for Post-Trial Relief, we are guided by the law we followed in Covalesky, 2003-EQ-60069 (Jan. 14, 2014) at 9, which states:

> In performing the first stage of analysis, the court is guided by two scopes of review. Where a mistake or series of mistakes are alleged to have occurred, which is our case, the court is to apply a narrow scope of review using the applicable standards for factual, legal, or discretionary matters alleged to be in error.
> Conversely, if allegations are made that a new trial is appropriate "in the interests of justice" or in the name of justice then a broad scope of review implicating the entire trial record is in order. Harman, 562 Pa. at 467-68; Divilly v. Port Authority of Allegheny County, 810 A.2d 755 (Pa. Cmwlth. 2000), appeal denied, 829 A.2d 1158, 574 Pa. 749.
> Using the narrow scope of review, we look to the type of error alleged. If the error alleged is factual, then factual error analysis of a narrow scope must be conducted. Id. In our case, the Court acted as the finder of fact. A jury, like any other fact finder, ". . . may accept

4

Circulated 02/27/2015 02:49 PM

all, none, or part of any expert's testimony . . ." (emphasis added) (citing Donoughe v. Lincoln Electric Co., 936 A.2d 52 (Pa. Super. 2007)). Even un-contradicted testimony need not be accepted as true or accurate, especially opinion evidence. Taliaferro v. Darky Twp. Zoning Hearing Bd., 873 A.2d 807 (Pa. Cmwlth. 2005).

Therefore, the court's findings of fact must be tested under an abuse of discretion layer of analysis. If the mistake alleged involves a discretionary act, it should be tested for abuse of the exercise of that discretion in order to determine if error has occurred. The standard of review of a trial court's decision post-trial is whether the trial court palpably and clearly abused its discretion or committed an error of law which controlled the outcome of the case. Coker v. Flickinger Co., 553 Pa. 441, 445, 625 A.2d 1181 (Pa. 1993). . . . "Abuse of discretion is not a mere error of judgment; one must show that the law was misapplied or overridden, or that the judgment exercised was manifestly unreasonable or the result of bias, prejudice or partiality." Covalesky, *supra* at 13 (citing Cacurak v. St. Francis Medical Center, 823 A.2d 159 (Pa. Super. 2003).

Covalesky v. Covalesky, 2003-EQ-60069, *supra* at 9, 13.

In Covalesky, we also noted "a narrow scope of review is appropriate to apply when specific reasons are raised as the only basis for a new trial." Id. at 10. Since specific reasons were the only reasons raised as the basis for a new trial in Covalesky, a narrow scope of review was performed. Id. Likewise, in the matter before us, Defendant Davis has raised specific issues on their respective motion for a new trial. Therefore the narrow scope of review is required in the present case.

## LEGAL ANALYSIS

To assess Defendants' claims, we must first examine whether we believe a mistake was made at the trial court. Covalesky, *supra* at 8-9; this Opinion at 3-4. If the

court concludes a mistake was made, we must analyze whether that error so prejudiced the moving party that it rose beyond harmless error to the point of being reversible error. Covalesky, *supra* at 13 (internal citations omitted).

I.  **The Trial Court Properly Found That Defendants Breached the Bad Faith Statute, 42 Pa.C.S. § 8371**

Defendant first argues that the Court's finding that Defendants breached the Bad Faith Statute, 42 Pa.C.S. § 8371, is erroneous because Plaintiffs did not meet their burden of proving bad faith by the standard of clear and convincing evidence.

We find no error was made in our determination of Defendants' bad faith pursuant to 42 Pa.C.S. § 8371. Support for Defendants' bad faith by clear and convincing evidence exists in the record in the form of correspondence between Plaintiff-insureds and Defendant-insurer; correspondence between Defendants' claims attorney and claim manager; testimony of witnesses of Plaintiff and Defendant; and in the form of admissions by Defendant-insurer, as noted in our August 15, 2013 Opinion at pp.8-9. See also Defendant's Proposed Conclusions of Law Nos. 3-4.

Accordingly, since the record supports our factual conclusion, the relief requested by Defendants with respect to the trial court's finding of Defendant's bad faith is denied and dismissed.

II.  **The Trial Court's Lost Profits Award Was Proper**

Defendant next argues the trial court's award of lost profits was erroneous because the lost profits award did not follow from an application of the standard of clear and

1994a

convincing evidence. Specifically, Defendant argues that although the trial court acknowledged this standard, there was no showing that 1. Plaintiffs' damages were proximately caused by Defendants' wrong, 2. there was no reasonably certain proof of the damages, and 3. the damages were not foreseeable. See Defendant's Brief in Support of its Motion for Post-Trial Relief at pp. 4, 20, and 24. Built into Defendant's argument is their claim that Plaintiffs did not establish lost profits with reasonable certainty since the projected profit was speculative with respect to increased construction costs and depreciation of the townhomes. Id. at pp. 6, 9, and 17.

As we did in our review of our finding of Defendant's § 8371 bad faith above, if the court must review whether a mistake was made in its determination of lost profits, and if we conclude there was such mistake, we must analyze whether that error so prejudiced the moving party that it rose beyond harmless error. See this Opinion at 3-4, citing Covalesky, supra, at 8-9, 13; Harman, 562 Pa. at 467; Bey, 789 A.2d at 236; and Luzerne Co. Flood Protection Auth., 825 A.2d 779. With respect to the court's analysis of lost profits, we find no mistake was made. Our conclusion is supported by discussion of the 3 elements on this page above with respect to Plaintiffs' increased construction costs and depreciation damages due to Defendant's conduct.

1. There was a Showing that Plaintiffs' Damages Were Proximately Caused by Defendants' Wrong

Defendants allege that the court did not prove by clear and convincing evidence that Plaintiffs' damages were proximately caused by Defendant's wrong. See Defendant's Brief in Support of its Motion for Post-Trial Relief at 20. As discussed in our August 15, 2013 Opinion, this Court, as finder of fact and assessor of credibility, properly

7

found Defendant's bad faith, breach of contract, and breach of the covenants of good faith and fair dealing were the cause of the delay in construction of Plaintiffs' twelve townhomes. See Davis v. Fidelity National Ins. Co., Memorandum and Order, 2010-CV-8868, (Aug. 15, 2013) at pp. 12-18 (hereinafter "Davis, 2010-CV-8868"). The trial court properly assessed its award of primary lost profits, based on its review of the record. The court found credible the evidence presented by Plaintiff and Defendant appraisers and Plaintiffs' contractor regarding depreciation of home values and increased construction costs of the homes as a result of the delay in their construction.

Accordingly, since the record supports our factual conclusion, we find no error that Plaintiffs' damages were proximately caused by Defendant's wrong.

2. Plaintiffs Lost Profit Damages (As Laid Out By the Court With Respect to The Depreciation and Increased Construction Cost Damages, Included in the Court's Determination of Lost Profits) Were Established with Reasonable Certainty

Defendants also argue the trial court's lost profits award flows from a misapplication of the correct legal standard requiring "reasonably certain proof." Defendants allege that the lost profits award was precluded by the trial court's own findings concerning the lack of evidence for any timeframe for development and construction and the unreliability of hypothetical valuations, and specifically in the court's assessment of depreciation damages and increased construction costs. See Defendant's Brief in Support of its Motion for Post-Trial Relief at pp.17-18.

As we did above in our review of the August 15, 2013 findings of Defendant's bad faith and Defendant's wrong causing Plaintiff harm, we again note that to whether there was a mistake, a court must begin with an analysis of the alleged underlying conduct or

8

Circulated 02/27/2015 02:49 PM

omission by the trial court that forms the basis for the request or motion for new trial. Next, the court must also decide whether there are one or more mistakes that implicate factual, legal, or discretionary matters, that may have occurred during trial. See this Opinion at 3-4 (citing Covalesky, 2003-EQ-60069 at 8-9, 13; Harman, 562 Pa. at 467; Bey, 789 A.2d at 236; Luzerne Co. Flood Protection Auth., 825 A.2d 779). As set forth below in sections a. and b. below, we hold that based on the record there was no mistake in our finding of lost profits. We also hold lost profits were established with a reasonable certainty.

a. The Trial Court Properly Determined Depreciation Damages

This Court made no mistake in its analysis of depreciation damages. The trial court, as sole assessor of credibility, may believe all, part, or none of the evidence presented. Lou Botti Construction v. Harbulak, 2000 Pa. Super. 287, 760 A.2d 896, 898 (2000). This Court found the evidence offered by Plaintiff and Defendants' licensed real estate appraisers "to be competent, credible, relevant, and admissible." See Davis, 2010-CV-8868, Introduction at p.2, and Conclusions of Law at p.21 ¶ 20. The Court, in properly exercising its discretion as fact finder, determined a depreciation value of the townhomes was somewhere in between the timelines asserted by Plaintiff and Defendants' expert real estate appraisers, and allowed for $135,000 for depreciation, half of what Plaintiff's expert appraised for depreciation. See Davis, 2010-CV-8868 at p.21. Where the amount of damages can be fairly estimated from the evidence, the recovery will be sustained even though such amount cannot be determined with complete accuracy. Kaczkowski v. Bolubasz, 491 Pa. 561, 567, 421 A.2d 1027 (1980).

Accordingly, since the trial court's determination of depreciation damages are supported in the record in the form of the testimony of Plaintiff and Defendant's appraisers, depreciation damages were established with a reasonable certainty. As such, we find no mistake made by the trial court in its calculation of depreciation damages.

b. The Trial Court Properly Determined Increased Construction Costs

Likewise, in performing the same review of whether the court made a mistake in its finding of Plaintiff's increased construction costs of the townhomes, the trial court made no such mistake. See Covalesky, 2003-EQ-60069 at 8-9, 13; Harman, 562 Pa. at 467; Bey, 789 A.2d at 236; Luzerne Co. Flood Protection Auth. 825 A.2d 779. The trial court found Plaintiffs' building contractor's testimony and evidence with regard to increased construction costs to be "competent, credible, relevant, and admissible." See Davis, 2010-CV-8868, Introduction at p.2 and Conclusions of Law at p.21. The court's determination as to increased construction costs is therefore supported by testimony in the record. We find no error in the calculation of increased construction costs.

Accordingly, since the trial court's findings of depreciation and increased construction costs are both supported in the record, the trial court made no mistake in its findings as to lost profits. Lost profits were established with reasonable certainty.

3. The Trial Court Properly Found That Plantiffs' Lost Profits Were Foreseeable

Finally, in our review of the trial court's determination of lost profits, we must assess whether the court made a mistake in its determination that Plaintiffs' lost profits were foreseeable. See this Opinion at 3-4; Covalesky, 2003-EQ-60069 at 8-9. The trial

1998a

court properly found that Plaintiffs' lost profits were foreseeable. This determination is supported by the record. See Davis, 2010-CV-8868, Findings of Fact at pp.2-8.

This court, using its discretion as fact finder, found credible Plaintiffs' evidence at trial that Defendant had knowledge that Plaintiffs' title insurance policy was for residential development, including the construction of townhomes. The court found Defendant had this knowledge both before and at the time the policy was issued.

We also found credible evidence in the record showing that Defendants were aware of the delay they had caused in the construction. See N.T. Vol. I, p33-34 (hereinafter "N.T."); Davis, 2010-CV-8868, Non-Jury Trial (Lacka. Co.) (Jan. 29-31, 2013). In addition, the record supports that it was reasonable for Defendant to have known or should have known market conditions change from year to year and delay would affect the value of Plaintiffs' development. Defendants' appraiser Mr. Yuter, acknowledged at trial how market conditions can change drastically from year to year. See N.T. Vol. III p.69 line 24-25.

Therefore, we made no mistake in finding Plaintiffs' damages for lost profits in the form of increased cost of construction and depreciation were reasonably foreseeable.

As this court properly exercised its discretion as fact finder to determine that 1. Plaintiffs' lost profits were caused by Defendant's wrong; 2. the lost profits were established with reasonable certainty; and 3. the lost profits were reasonably foreseeable, as supported by the record, there was no mistake in the court's determination of lost profits. Accordingly, the relief requested by Defendants with respect to the trial court's finding of lost profits is denied and dismissed.

III.     **Whether The Trial Court's Award of Lost Profits Was "In Derogation of the Contractual Liability in the Title Insurance Policy" Is to No Avail**

Defendant next argues that the trial court's award of compensatory damages in the form of lost profits was trial court error because a lost profits award is precluded by the title insurance policy. See Defendant's Brief in Support of Motion for Post-Trial Relief at p.21. Defendant's argument is without merit. No mistake was made at the trial court. See Covalesky, 2003-CV-60069 at 8-9. As noted in our August 15, 2013 Opinion at p.16, in Pennsylvania, consequential damages may be awarded for bad faith. See Davis Opinion, Conclusions of Law at p.15 ¶ 1. As addressed both in the August 15, 2013 Opinion at pp.13-17 and p.21 and in this Opinion on p.6, the trial court properly found that Defendant engaged in bad faith conduct under 42 Pa.C.S. § 8371(a) and that Plaintiffs endured lost profits. Finally, primary lost profits are a proper measure of consequential damages in this case. Davis, 2010-CV-8868 at p.15 ¶ 2 and p.16 ¶ 3.

In properly determining Defendant's bad faith and Plaintiffs' lost profits being caused by this bad faith, the trial court's award of lost profits, supported by the record, was appropriate. Defendant's requested relief with respect to a lost profits award "in derogation of the contractual liability in the . . . policy" is denied and dismissed.

IV.     **The Trial Court's Punitive Damages Award of $1,572,909.24 Was Proper**

Defendant also alleges that the trial court erred in awarding excessive punitive damages because there was no finding of ill-will, fraud, or dishonest purpose by Defendant. We hold there was no mistake in the trial court's conclusion of Defendant's ill-will and resulting calculation of punitive damages. See Davis, 2010-CV-8868 at p.

14 ¶ 22. The punitive damages award is based on the various factors set forth in detail in our August 15, 2013 Opinion, all of which are supported in the record through stipulations, submissions of the parties, exhibits, and testimony. See Davis, 2010-CV-8868, at pp.21-23. In addition the facts of our case follow case law on punitive damage multipliers. Id.; see also Plaintiff's Brief in Opposition to Defendant's Motion for Post Trial Relief at pp.18-19 (and case law within). As the record supports the punitive damages award, no mistake has been made. See Covalesky, *supra* at 8-9. Therefore, the relief requested by Defendants with regard to punitive damages is denied and dismissed.

Since the record supports the trial court's decisions as to all components raised by Defendant in Defendant's Motion for Post-Trial Relief, the trial court's order must be affirmed. Randt v. Abex Corp., 671 A.2d 228, 448 Pa. 224 (Pa. Super. 1996) (emphasis added).

An appropriate final order and entry of judgment follows.

2001a

| RICHARD DAVIS and | : | THE COURT OF COMMON PLEAS |
|---|---|---|
| MARIA DAVIS | : | OF LACKAWANNA COUNTY |
| Plaintiffs | : | |
| | : | |
| v. | : | CIVIL ACTION - LAW |
| | : | 2014 MAR 28 P 2: 47 |
| FIDELITY NATIONAL | : | 2010-CV-8868 |
| INSURANCE COMPANY, | : | |
| d/b/a FIDELITY NATIONAL | : | |
| TITLE INSURANCE COMPANY | : | |
| OF NEW YORK | : | |
| Defendants | : | |

## FINAL ORDER

AND NOW, this 28th day of March 2014, upon this Court's thorough review of the pleadings, the answers thereto, the briefs in support and in opposition, the trial record transcript and arguments of able counsel, it is hereby held:

(1) Defendants' Motion for Post-Trial Relief is DENIED and DISMISSED;

(2) The Non-Jury Decision by the Court filed August 15, 2013 is hereby AFFIRMED in all respects per Pa.R.C.P. 227.1;

(3) The Clerk of Judicial Records is directed to enter judgment in accordance with the Non-Jury Decision and Order filed August 15, 2013;

(4) This Order, in conjunction with our non-jury decision of August 15, 2013 and with our September 16, 2013 Order Denying and Dismissing Plaintiffs' Motion for Post-Trial Relief represents a final order for appellate purposes and for Pa.R.C.P. 1925(b) purposes.

BY THE COURT:

_____

J.

14

2002a

*Cc: Written notice of the entry of the foregoing Memorandum and Order has been provided to each party pursuant to Pa.R.C.P. 326(a)(2) by mailing time-stamped copies to:*

Attorney for Plaintiffs
Carl J. Guagliardo, Esq.
Selingo Guagliardo, L.L.C.
345 Market Street
Kingston, PA 18704

Attorney for Defendants
Scott M. Rothman, Esq.
Halberstadt Curley LLC
1100 E. Hector Street, Suite 425
Conshohocken, PA 19428